KOHLHOFF, Plaintiff in error, v. STATE,
Defendant in error.

Supreme Court

*No. 76–359–CR.  Submitted on briefs September 7, 1978.—*
*Decided October 3, 1978.*
(Also reported in 270 N.W.2d 63.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Mel S. Johnson,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Pamela Magee-Heilprin,* assistant attorney general.

HANSEN, J. The defendant seeks reversal on two grounds: (1) The evidence was not sufficient to support

the verdict of the jury, (2) the response of the trial court to the request of the jury for testimony clarification constituted reversible error. In the alternative, the defendant asks that the judgment of conviction be reversed and the case be remanded for a new trial in the interests of justice.

We have reviewed the record and conclude that the judgment and order of the trial court should be affirmed. Therefore no useful purpose will be served by an extensive detail of the testimony.

The defendant was engaged to marry Doris Bautch and had been living with her and her five children off and on for approximately eight years. The complaining witness, Jean Marie Bautch, thirteen years of age at the time of the alleged offense, was the oldest child. The trial was comparatively brief. Three witnesses testified, the complaining witness, the defendant, and the police officer to whom the complaint was made.

Jean Marie testified that late in the evening of April 27, 1975, while her mother was at work, the defendant came into the bedroom where she and her three sisters (ages 6, 7 and 10) were sleeping and had "sexual intercourse" with her which she described as placing his finger in and licking her vagina. She also said she did not know whether her sisters awoke during the incident, and that she did not say anything while the defendant was there because she was afraid she would be beaten. She testified that the defendant would beat her when he thought she was telling a lie even though she was telling the truth. On cross-examination, she again said she did not yell, but after having her preliminary hearing testimony that she had yelled read back to her she said she didn't know whether she had yelled or not but that she knew she had been tossing and turning.

She testified that the defendant had engaged in similar sexual conduct with her on four or five previous occasions, once in February of 1975. She said that she ran

away on the day following the incident in February and told her mother about it when she returned. She said she thought her mother had told the defendant about her accusation since the defendant later beat her with his belt and said she wasn't to tell her mother about it because then he wouldn't have a place to stay.

She testified she told the police about this incident the day after it occurred. However, on cross-examination she said it was on a day about two weeks later when the police had been called to the home because of a fight between the defendant and her mother. At the time she told the police about it she had bruises on her arms as a result of being spanked or beaten by the defendant.

On cross-examination, she also admitted that she never liked the defendant and didn't like it when the defendant and her mother fought; that she didn't consider him to be her father and would prefer that her mother not marry the defendant; that she felt he punished her unfairly; and that she and her mother had gotten along all right since the defendant had been in jail.

The officer who took the complaint from Jean Marie testified that he had been to the house earlier that morning regarding a domestic quarrel between the defendant and Mrs. Bautch regarding the children. He testified that she had told him the same facts she had related in court; however, on cross-examination, he stated that Jean Marie had told him the defendant had also fondled her breasts. He also confirmed that she had bruises on her arm that morning and that she told him the defendant had caused them. The officer testified that when questioned after his arrest the defendant denied the accusation and explained that Jean Marie just wanted to get back at him.

The defendant denied that he had ever engaged in any sexual conduct with Jean Marie. He testified that on the night in question he had stopped off at the house about

midnight, after taking Mrs. Bautch to work, as he did every weekend, to check on the children. He said that the girls were asleep but that Michael (age 15) was still up and he sent him to bed. He said he did not talk to Jean Marie that night, merely looked in on her and her sisters.

The defendant testified that Jean Marie had been trying to break him and her mother up since 1968, when Jean Marie was six years old, and that she had said she would kill herself before she'd see him as her stepfather.

On cross-examination, the defendant testified that he was the father of Jenny Bautch, Doris Bautch's youngest daughter. He said he had denied that he was the father when Mrs. Bautch first brought a paternity action because his wife refused to allow him to admit it, and because at the time he thought it was better for Jenny. He said he didn't think his denial was a lie since at that time he wasn't sure if he was the father. On re-direct examination, the defendant testified further as to a paternity proceeding in 1968, wherein the defendant was alleged to be the father of Jenny. This testimony will be further detailed in our consideration of the issue relating to the clarification instructions which the jury requested from the trial court.

## SUFFICIENCY OF THE EVIDENCE.

This court's review is limited to determining whether the evidence adduced, believed and rationally considered by the jury was sufficient to prove defendant's guilt beyond a reasonable doubt. *State ex rel. Kanieski v. Gagnon,* 54 Wis.2d 108, 113, 194 N.W.2d 808 (1972). The jury may convict on the basis of uncorroborated testimony, *Grayson v. State,* 35 Wis.2d 360, 366, 151 N.W.2d 100 (1967), unless that testimony is patently or

inherently incredible. *Gauthier v. State,* 28 Wis.2d 412, 418, 137 N.W.2d 101 (1965). Inconsistencies and contradictions in a witness' testimony are for the jury to consider in judging credibility and the relative credibility of the witnesses is a decision for the jury. *Kain v. State,* 48 Wis.2d 212, 217, 179 N.W.2d 777 (1970). The jury may consider a witness' motives in this weighing process. *State v. Harling,* 44 Wis.2d 266, 276, 170 N.W.2d 720 (1969).

"The question of credibility between witnesses or in respect to the same witness is a matter for the jury to determine and not for a trial judge or for this court, unless it can be said that the testimony is incredible as a matter of law." *Nabbefeld v. State,* 83 Wis.2d 515, 529, 266 N.W.2d 292 (1978).

In *Grayson, supra,* the court noted that the victim's testimony was corroborated in all respects except for the facts of the attack itself and that her description of the incident was detailed. The court said credibility and interest were matters for the jury and only if the evidence were inherently incredible would this court substitute its judgment. In *Syvock v. State,* 61 Wis.2d 411, 213 N.W.2d 11 (1973), this court said the child's inconsistencies about the date of the incident and about how soon she told her mother did not mean the testimony was inherently incredible.

As frequently occurs in cases involving this offense, no witnesses were present at the time of the actual commission of the act except the victim and the defendant. In the instant case the defendant acknowledged he was present in the home at the time the offense is alleged to have occurred. The fact that the victim had bruises on her arm resulting from beatings by the defendant is corroborated to the extent that the police officer saw bruises on her arm. The testimony of both the victim and the defendant is plausible. From our review of the

record, it cannot be said that the testimony of either witness was patently or inherently incredible.

■

It was the duty and the responsibility of the jury to consider and determine the credibility of the witnesses based upon their testimony and general demeanor. The jury found the defendant guilty so they obviously assigned the greater credibility to Jean Marie. This assessment of credibility was within the province of the jury and the evidence in the record is sufficient to sustain the verdict.

■

The defendant asserts that Jean Marie's credibility was destroyed by her inconsistencies and improbable assertions. First the defendant challenges Jean Marie's statement that her sisters did not wake up during the incident even though she tossed and turned and may have yelled. Although the word *yelled* is used by the witness, Jean Marie, no descriptive testimony is given. None of the sisters were called as witnesses. There was testimony they slept soundly. Furthermore, there was no testimony they did not wake up. It would not be incredible that in the household Jean Marie described that a younger sister who did wake during this incident would remain silent. Jean Marie testified that the defendant beat them when he was angry. A child awakened in the middle of the night by such an incident involving a man who had terrorized her before might well pretend to be asleep. This portion of Jean Marie's testimony is not patently incredible.

■

The defendant also challenges Jean Marie's failure to report the attack right away. Again, considering the family situation and her testimony that she had received no help from her mother the first time she mentioned the defendant's attacks, her silence is not incredible.

Jean Marie's mother did not testify, and the jury might have found it reasonable that Jean Marie's first report would be to a police officer who intervened in a family fight.

Jean Marie's dislike of the defendant is obvious and admitted and the defendant emphasizes that as a motive for what he claims are her false accusations. Again, motive is an element of credibility for the jury to weigh. *Kain, supra.* The fact of this hostility was amply demonstrated to the jury. The jury was entitled to give it whatever weight they thought appropriate.

The evidence adduced, believed and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt.

## *JURY INSTRUCTIONS.*

This issue is directed toward testimony given in the instant trial which related to a paternity action in 1968, at a time when Jean Marie, the complaining witness, was six years of age.

In the case at bar the defendant testified he was the father of Jenny Bautch, the subject child of the paternity proceeding and the youngest child of Doris Bautch. He further testified he had denied he was the father when Mrs. Bautch instituted the paternity action in 1968, because his wife refused to allow him to admit it and because he thought it was better for Jenny. Also he didn't think his denial was a lie since at the time he wasn't sure if he was the father.

The crux of the testimony by the defendant concerning the 1968–paternity suit was that it was an attempt to impeach the credibility of Jean Marie, the complaining witness in the instant case.

The defendant testified that in 1968, before Jenny was born, Jean Marie had told him that she had seen Doris

Bautch, her mother, and another man "making love on the front room couch." He further testified that after the paternity action and with respect to an appeal, he and Doris Bautch each took a polygraph test and that "[r]ather than appeal it, they gave [us] a lie detector test and went on the basis of that." He further testified that after the polygraph tests the paternity proceedings were dropped and he was *not adjudicated the father*.

The defendant also testified that he and Mrs. Bautch contemplated marriage, and that after he and Mrs. Bautch were married if Jean Marie did not stay in the foster home they had made plans to send her to Mrs. Bautch's sister in Florida.

After the jury had deliberated for just over an hour they requested clarification of some testimony. They first expressed some confusion regarding the police officer's testimony which was then read back for them in full. The jury foreman also asked:

"Also, another point was the lie detector test for paternity. There's some confusion there. The maternity or paternity suit, the lie detector test taken by the mother and the defendant. We don't understand, and what did that show."

The record then indicates: (Conference held in chambers, outside the hearing of the jury, between the court, both counsel and defendant present. Portions of the testimony read back.)

The following then occurred:

"(JURY PRESENT.)
"*Court:* As to your second question, the testimony the transcript reveals that both Mr. Kohlhoff and Mrs. Bautch, according to Mr. Kohlhoff's testimony took a polygraph examination after the paternity action was commenced. The results of the polygraph examination were not testified to. Does that answer—it doesn't clear up anything.
"*Juror:* You say it was not testified to?

"*Court:* The results of the polygraph examination were not testified to. Mr. Kohlhoff did go on to testify in response to other questions that he was *adjudicated not the father of the child.*

"*Juror:* Which was the blood test, would that be the blood test?

"*Court:* He said that he took a blood test as well as the polygraph test. And that Mrs. Bautch also took a polygraph test.

"*Foreman:* I think it helps some.

"*Court:* If there is any other further question or any other point you'd like cleared up in that regard, we can do that now.

"*Juror:* Who dropped the charges—

"*Court:* Wait, I think Mr. Reifenberg should do all the talking. So if you want to confer, you may do so.

"*Foreman:* There were charges of paternity. Was that a state charge or the mother make that charge? There were charges were dropped. That's the sentence we just heard. What charges were dropped?

"*Court:* No, there wasn't. It wasn't a matter of dropping charges. Mr. Kohlhoff testified that he was *adjudicated not the father of the child.* Now, that doesn't mean that charges were dropped. He was *found not to be the father of the child.*

"*Mr. Reddin:* Your Honor, may we approach the bench?

"(Bench conference had between the court and both counsel.)

"*Court:* Counsel has just corrected me as to what the testimony was. The testimony revealed that Mr. Kohlhoff was *not found to be not the father, but what happened was that he was not adjudicated the father. There's a difference. In other words, as, on one hand it sounds as though there was a judicial proceeding and that he was found not to be the father of the child. That was not what the testimony was. The testimony was simply that he was not adjudicated the father,* which means that the charges could have been dropped or that no proceedings continued after that time. But the testimony didn't go into that any more deeply than that. He was just found—he was just not adjudicated the father for whatever reason. The reason is not stated." (Emphasis added.)

The defendant argues that there was evidence regarding the results of the polygraph tests and that the trial court's response to the jury's inquiry was therefore inaccurate and misleading. The defendant contends that his testimony indicated that the results of the lie detector tests showed that Jean Marie's accusation was not true and to that extent there was testimony as to the results. Defendant argues that this alleged error was highly prejudicial since it prevented the jury from considering evidence which reflected on Jean Marie's credibility and which related to her motive for falsely accusing the defendant.

The state contends that the trial court's response was correct, that the defendant did not testify to the results of the polygraph tests, only to his own conclusion which was based on the results. We agree with this contention. The defendant testified that after he and Doris Bautch had taken the polygraph tests, the paternity proceedings were "dropped" and he was not adjudicated the father of the child.

When, during its deliberations, a jury poses a question regarding testimony that has been presented, the jury has a right to have that testimony read to it, subject to the discretion of the trial judge to limit the reading. *Jones (George Michael) v. State,* 70 Wis.2d 41, 57, 233 N.W.2d 430 (1975) ; *State v. Cooper,* 4 Wis.2d 251, 255–256, 89 N.W.2d 816 (1958). The judge may choose to summarize the testimony for the jury in lieu of having it read. *Salladay v. Town of Dodgeville,* 85 Wis. 318, 323, 55 N.W. 696 (1893) ; *Hannon v. State,* 70 Wis. 448, 454, 36 N.W. 1 (1888). Any such summary must be fair and accurate. Since these matters are within the trial judge's discretion, error can be assigned only for an abuse of discretion. *State v. Tarrell,* 74 Wis.2d 647, 659, 660, 247 N.W.2d 696 (1976) ; *Patterson v. Phillips,* 216 Wis. 165, 172, 256 N.W. 624 (1934).

The statement of the trial judge that there was no evidence regarding the results of the polygraph tests is in fact a correct and accurate summary of the testimony. The defendant did not testify as to the results; he merely testified to a conclusion he drew from them and the jury was so instructed.

There is absolutely no indication in the record that any objection was made as to the manner in which the trial judge reinstructed the jury. In fact both counsel and the defendant participated in a conference in chambers and out of the presence of the jury, at which part of the testimony was read and both counsel further participated in a bench conference in regard to the clarification instruction. We can find no reversible error.

We do, however, take this occasion to make two observations. We have held that when a jury poses a question regarding testimony that has been presented, the judge may, in the exercise of his discretion, choose to present a summary of the testimony to the jury instead of having it read. Nevertheless this case presents persuasive argument for the proposition that the far better practice is to have the testimony read to the jury.

Further, the record in this case does not set forth in detail the conference in chambers between the defendant, respective counsel, and the trial judge. The record only contains the reporter's note that such a conference was held and that a portion of the testimony was read. We believe such conferences should be transcribed.

We are strongly of the opinion that when a jury requests clarification of the testimony, the better practice is to restrict such clarification to a reading of the testimony. In the case here under consideration, if the conference in chambers between the defendant, respective

counsel, and the trial judge, had been recorded, and the request of the jury for clarification of testimony been directed only to a reading of the testimony, this review, in all probability, would not be before us.

### INTEREST OF JUSTICE.

The defendant seeks a new trial in the interest of justice, sec. 251.09, Stats. The same two arguments are repeated. Apparently the contention is that, taken together, they warrant granting this defendant a new trial in the interest of justice. We have found them both to be without substance. The argument here advanced for a new trial in the interest of justice has been previously rejected. *Mentek v. State,* 71 Wis.2d 799, 809, 238 N.W. 2d 752 (1976).

A new trial will be granted in the interest of justice only if this court is convinced that there has been a miscarriage of justice and a new trial under optimum conditions would produce a different result. This is not such a case. *Grayson v. State, supra,* p. 368. *Gauthier v. State, supra,* p. 421.

The judgment and order of the trial court are affirmed.

*By the Court.*—Judgment and order affirmed.