STATE of Wisconsin, Plaintiff-Respondent,†

v.

Ricky McMORRIS, Defendant-Appellant-Petitioner.

Supreme Court

*No. 95–2052–CR.  Oral argument September 4, 1997.—Decided October 30, 1997.*

(Also reported in 570 N.W.2d 384.)

†Motion for reconsideration denied December 16, 1997.

For the defendant-appellant-petitioner there were briefs and oral argument by *Walter W. Stern,* Union Grove.

For the plaintiff-respondent the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the brief was *James E. Doyle,* assistant attorney general.

¶ 1. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE. This is a review of an unpublished decision of the court of appeals, *State v. McMorris,* No. 95–2052-CR, unpublished op. (Wis. Ct. App. Oct. 2, 1996), affirming in part and reversing in part an order of the Circuit Court for Racine County, Dennis J. Barry, Judge. The circuit court denied the motion of the defendant, Ricky McMorris, to suppress two identifications: (1) the eyewitness's in-court identification of the defendant and (2) the eyewitness's identification of the defendant in a post-indictment, pre-trial lineup conducted without notice to and in the absence of his counsel in violation of his Sixth Amendment right to counsel.

¶ 2. The court of appeals affirmed that part of the circuit court order denying the defendant's motion to suppress the in-court identification. The defendant

seeks review of this part of the court of appeals decision. The court of appeals reversed that part of the circuit court order denying the defendant's motion to suppress the constitutionally defective lineup identification. Neither the State nor the defendant challenges this part of the court of appeals decision.[1] The court of appeals remanded the cause to the circuit court for further proceedings, and the parties agree that the cause must be remanded.

¶ 3.   The only issue before this court is the admissibility of the eyewitness's in-court identification of the defendant after an identification in a lineup that violated the defendant's Sixth Amendment right to counsel. We hold that the eyewitness's in-court identification should be suppressed because the State has not shown by clear and convincing evidence that the eyewitness's in-court identification of the defendant had an "independent origin," that is, that the source of the in-court identification was the eyewitness's observation of the robber during the robbery and was independent of a lineup that violated the defendant's Sixth Amendment right to counsel. *See United States v. Wade*, 388 U.S. 218 (1967). Accordingly, we reverse that part of the court of appeals decision admitting the eyewitness's in-court identification.

I.

¶ 4.   The facts are undisputed for purposes of this review. On December 3, 1994, Patricia Jordan, a 67-

---

[1] The State did not seek review of this part of the decision of the court of appeals because, as the State's brief explains, the United States Supreme Court has declared that evidence of an identification made at a lineup which was held without notice to and in the absence of counsel must be excluded from the trial. *See Gilbert v. California*, 388 U.S. 263, 272–73 (1967).

year-old white woman, was robbed at knife-point as she was working alone at a grocery store in Mt. Pleasant, WI.

¶ 5.  According to Jordan, a man entered the store, walked up to the cash register where she was working and asked her for some change. Jordan was standing behind the counter, and the man was standing a couple of feet across from her on the other side. When Jordan opened the cash register to provide the change, the man pointed a knife at her, told her to leave the cash drawer open and took money from the drawer. As the robber removed the cash from the drawer, Jordan backed away about 10 feet from the cash register and hid behind a meat slicer, while continuing to watch the robber. Jordan was wearing her eyeglasses at the time of the robbery, and the store was well lit. After the robber left the store, Jordan called the police.

¶ 6.  About 15 to 20 minutes after the robbery, Officer Jason Wortock of the Mt. Pleasant Police Department arrived at the store. He interviewed Jordan and took down the physical description she gave of the robber. Jordan testified that the robber was an African-American male, at least six feet tall, wearing a white golfer's cap and a tan jacket. She said that she had never seen the robber before. She described the knife he used as a tapered, single-edged knife about 12 inches long. Jordan was the sole eyewitness to the robbery and is hereafter referred to as the eyewitness. The police never recovered, by search warrant or otherwise, the knife, cap or jacket of the robber.

¶ 7.  Later on the day of the robbery Officer Fulton Bell and Investigator Jayn Long showed the eyewitness six photographs of potential suspects, including one of the defendant. All the photographs were of African-American men, some with facial hair,

some without. Apparently the police were uncertain at this time whether the robber had facial hair. The eyewitness did not identify the defendant or anyone else from the photo array as the robber.

¶ 8.   A store surveillance camera taped the robbery in its entirety. According to the tape, the robbery lasted approximately 25 seconds. The eyewitness viewed the videotape shortly after the robbery and turned it over to Officer Wortock who viewed the videotape with several other officers, including Officer Bell and Investigator Long.

¶ 9.   After seeing the videotape, Officer Bell concluded that the robber looked like the defendant with whom Bell was familiar because they had grown up in the same neighborhood. Officer Bell testified that he had seen the defendant on November 29, 1994, four days before the robbery while responding to a civil disturbance call, and had observed that at that time the defendant had full facial hair and was wearing a tan jacket and a cap. (The defendant was not involved in the civil disturbance.)

¶ 10.   Based upon her observation of the videotape and her subsequent in-person observation of the defendant at the Racine County Jail where he was incarcerated on an unrelated charge, Investigator Long concluded that the defendant was the robber. Prior to the robbery, Investigator Long had not been acquainted with the defendant.

¶ 11.   On January 4, 1995, the defendant was charged with armed robbery, and a public defender was appointed the defendant's counsel. Five days later on January 9, 1995, Investigator Long, with the assistance of Corporal James Stratman, staged a lineup with five African-American males, including the defendant, all of whom were approximately the same weight

162

and age as the defendant and all of whom had facial hair. Apparently the police at this time were operating on the premise that the robber had facial hair. After initially asking another man in the lineup to step forward, the eyewitness identified the defendant as the robber.

¶ 12.   The defendant's counsel did not attend the lineup, and at no time did the defendant waive his right to have his counsel present. Investigator Long and Corporal Stratman failed to notify the defendant's counsel about the lineup, saying they were unaware that the defendant was entitled to have counsel present at a post-indictment lineup procedure. The officers did not photograph the lineup, either by video or still camera.

¶ 13.   The eyewitness subsequently identified the defendant at the preliminary hearing on January 24, 1995, when he was wearing an orange jail uniform and was seated next to an attorney at a table. At the preliminary hearing the eyewitness testified that she knew the robber had long sideburns but was not sure if he had a mustache or beard. When asked at the preliminary hearing why she had selected the defendant at the lineup, the eyewitness testified that she chose him, in part, because he was tall.

¶ 14.   The defendant filed a pre-trial motion to suppress the lineup identification on the ground that the lineup had been improperly conducted in the absence of his counsel. He also filed a pre-trial motion to suppress the in-court identification, claiming that it was tainted by the unconstitutional out-of-court lineup and that the in-court identification did not have an origin independent of the lineup.

¶ 15.   The circuit court refused to suppress the lineup identification, concluding that the police had acted in good faith and that the lineup procedure was

not otherwise impermissibly suggestive. The circuit court ruled that the jury would be instructed that the defendant had been deprived of his right to counsel at the lineup.

¶ 16.   The court of appeals granted the defendant leave to appeal the suppression order and ordered the lineup identification suppressed. This part of the court of appeals decision is not before us.

¶ 17.   In addition, the court of appeals affirmed the circuit court decision admitting the in-court identification on the ground that the State had shown by clear and convincing evidence that an independent source existed for the eyewitness's in-court identification and that the in-court identification had not been tainted by the lineup identification.[2] This part of the court of appeals decision is before us on review.

## II.

¶ 18.   This court has not previously discussed the applicable standard of review in determining whether an independent source exists for an in-court identification made after a lineup that violated an accused's Sixth Amendment right to counsel. The court has, however, considered the standard of review applicable to an analogous issue of attenuation in the Fourth Amendment context. In *State v. Anderson*, 165 Wis. 2d 441, 447–48, 477 N.W.2d 277 (1991), this court characterized as a constitutional fact the question whether evidence should be suppressed as the fruit of a prior illegal search or whether the evidence was sufficiently

---

[2] In reaching this conclusion, the court of appeals considered the certainty of the eyewitness's testimony at the preliminary hearing and the suppression hearing. *See State v. McMorris*, No. 95–2052-CR, unpublished op. at 11 n.5 (Wis. Ct. App. Oct. 2, 1997).

attenuated so as to be purged of the taint. Adhering to the *Anderson* analysis, we characterize as a constitutional fact the question whether an independent source exists for an in-court identification made after a lineup that violated an accused's Sixth Amendment right to counsel, and we apply the standard of review ordinarily applied to questions of constitutional fact.[3]

¶ 19.  Questions of constitutional fact are sometimes referred to as mixed questions of fact and law, requiring the court to determine what happened and whether the facts found fulfill a particular legal standard.[4] Ordinarily, when reviewing a mixed question of fact and law, appellate courts engage in a two-part inquiry. The first inquiry relates to the circuit court's findings of fact. Neither the court of appeals nor this court will reverse a circuit court's findings of historical or evidentiary fact unless they are clearly erroneous. The second inquiry relates to the question whether the historical or evidentiary facts satisfy the relevant constitutional standard. Such an inquiry is made by this court independent of the circuit court and court of appeals. However, in deciding whether the facts satisfy the constitutional standard this court may benefit from and draw upon the reasoning of the circuit court and court of appeals and may draw upon the circuit court's

[3] For a similar analysis, see *Tomlin v. Myers*, 30 F.3d 1235, 1241 n.12 (9th Cir. 1994).

The State's brief asserts that not all courts use this standard of review in deciding identification issues. The cases the State cites, however, do not involve the identification issue posed in this case, namely an in-court identification after an identification in a lineup that violated the Sixth Amendment. *See* Brief for State at 14 n.1.

[4] *See State v. Santiago*, 206 Wis. 2d 3, 17–18, 556 N.W.2d 687 (1996).

observational advantage. Nevertheless, this court independently measures the facts against a uniform constitutional standard.

¶ 20. The principal reason for independent appellate review of matters of constitutional fact is to provide uniformity in constitutional decision making.[5] In applying the skeletal constitutional rule, appellate courts flesh out the rule and provide guidance to litigants, lawyers, and trial and appellate courts.

¶ 21. We conclude, as did the parties, that whether an independent source exists for an in-court identification made after a lineup that violated an accused's Sixth Amendment right to counsel is a question of constitutional fact which we determine independent of the circuit court and court of appeals, benefiting from their analyses.

### III.

¶ 22. Our analysis begins with a summary of the law relating to the admissibility of an in-court identification of an accused after identification in a lineup is suppressed because the accused was deprived of the right to counsel at the lineup.

¶ 23. The parties acknowledge, and we agree, that the controlling United States Supreme Court decision in this case is *United States v. Wade*, 388 U.S. 218 (1967).

---

[5] *See State v. Fry*, 131 Wis. 2d 153, 171, 388 N.W.2d 565, *cert. denied*, 479 U.S. 989 (1986) ("The reason for independent appellate review of constitutional facts is [that] '[t]he scope of constitutional protections, representing the basic value commitments of our society, cannot vary from trial court to trial court, or from jury to jury.' ").

¶ 24.    In *Wade*, the Court held that an in-court identification subsequent to a constitutionally defective lineup in violation of an accused's Sixth Amendment right to counsel is not per se inadmissible. *See Wade*, 388 U.S. at 240. Once such a constitutionally defective lineup is established, the in-court identification is admissible if the State carries the burden of showing "by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *Wade*, 388 U.S. at 240. The in-court identification is admissible if made " 'by means sufficiently distinguishable to be purged of the primary taint.' " *Wade*, 388 U.S. at 241 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Thus, if the in-court identification has an independent source, the in-court identification is admissible.[6] The *Wade* test has been referred to as the "independent origin" test and as the "independent source" test. *See United States v. Crews*, 445 U.S. 463, 473 n.18 (1980).

¶ 25.    The *Wade* test places on the State the heavy burden of producing clear and convincing evidence for admission of in-court identification after identification in a lineup in which an accused's counsel was not present and no waiver of counsel occurred. Two reasons support imposing this burden on the State: First, *Wade* warns of the "vagaries of eyewitness identification" and "[t]he hazards of such [eyewitness identification] testimony." *Wade*, 388 U.S. at 228. Second, the lineup is a critical stage of the prosecution at which, as *Wade* explains, a lawyer can make a difference. *Wade*, 388

[6] *See United States v. Wade*, 388 U.S. 218, 241 (1967); *United States v. Crews*, 445 U.S. 463, 473 n.18 (1980).

U.S. at 236–37. Any lesser burden on the State would disregard the difficulties inherent in eyewitness identification and would render meaningless the Sixth Amendment right to counsel at a lineup.

¶ 26. According to the *Wade* Court, to determine whether the in-court identification is " 'sufficiently distinguishable to be purged· of the primary taint,' " a court should consider various factors including the following: (1) the prior opportunity the witness had to observe the alleged criminal activity; (2) the existence of any discrepancy between any pre-lineup description and the accused's actual description; (3) any identification of another person prior to the lineup; (4) any identification by picture of the accused prior to the lineup; (5) failure to identify the accused on a prior occasion; (6) the lapse of time between the alleged crime and the lineup identification; and (7) the facts disclosed concerning the conduct of the lineup. *See Wade*, 388 U.S. at 241.

¶ 27. The court has applied the *Wade* test to determine the admissibility of in-court identifications subsequent to lineups that violated the accused's Sixth Amendment right to counsel. *See, e.g., State v. Harper*, 57 Wis. 2d 543, 546, 205 N.W.2d 1 (1973).[7]

## IV.

¶ 28. Applying the *Wade* factors, the defendant argues that the constitutionally defective lineup taints the eyewitness's subsequent in-court identification.

[7] The court has also applied the *Wade* test in a case in which the accused's unlawful arrest was followed by a lineup identification and an in-court identification. *See State v. Walker*, 154 Wis. 2d 158, 188–89, 453 N.W.2d 127, *cert. denied*, 498 U.S. 962 (1990).

The State, also applying the *Wade* factors, argues that the eyewitness's in-court identification is sufficiently distinguishable from the lineup to be purged of the taint of the lineup. Our independent review of the record persuades us that the State has not shown by clear and convincing evidence that the eyewitness's in-court identification of the defendant is independent of the lineup.

¶ 29. The first *Wade* factor considers the witness's opportunity to observe the perpetrator at the time of the crime. In this case, it is arguable that the eyewitness had sufficient opportunity to observe the robber. The store was adequately lighted to permit the eyewitness a clear view of the robber; the eyewitness was wearing her eyeglasses at the time of the robbery; when the robber first approached the eyewitness, he was standing only a couple of feet away from her, directly across the counter.

¶ 30. On the other hand, the eyewitness's opportunity to observe the robber was limited. The entire incident lasted a mere 25 seconds. While a court cannot specify a minimum amount of time necessary to demonstrate a sufficient opportunity to observe, the length of time for observation of the perpetrator is important.[8] Moreover, as the robber took the money out of the cash register, the eyewitness moved back about 10 feet and hid behind a meat slicer while still observing him. The eyewitness, therefore, was not directly facing the robber throughout the entire 25-second incident. After reviewing the surveillance videotape, the circuit court found that the eyewitness's

---

[8] *See State v. Harper*, 57 Wis. 2d 543, 546, 205 N.W.2d 1 (1973) (in-court identification based on independent origin when witness observed perpetrator for two or three minutes).

169

opportunity to observe the robber lasted approximately 20 seconds.

¶ 31.　The court has also viewed the surveillance videotape, and it is difficult to determine from the tape how much time the eyewitness spent looking at the knife or the robber's face. At the suppression hearing, the eyewitness acknowledged that she concentrated on the knife during the robbery. She was able to give a detailed description of the knife. Furthermore, in this case, the usual dangers inherent in eyewitness identification may have been exacerbated because this was a cross-race identification.[9]

¶ 32.　Under these circumstances, 25 seconds may not have provided sufficient time for the eyewitness to observe the robber's features so that she could make an in-court identification independent of the unconstitutional lineup.

¶ 33.　The second *Wade* factor considers any discrepancy between a pre-lineup description and the accused's actual appearance. The eyewitness testified

---

[9] See Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* 97 (1992) ("It is well-established that there exists a comparative difficulty in recognizing individual members of a race different from one's own."); Neil Colman McCabe, *The Right to a Lawyer at a Lineup: Support from State Courts and Experimental Psychology*, 22 Ind. L. Rev. 905, 914 (1989) ("Several reviews of the literature on eyewitnesses have concluded that cross-race identifications are less reliable than when the witness and suspect are members of the same race.").

For a discussion of the dangers inherent in eyewitness identification and the desirability of using a detailed cautionary jury instruction regarding the fallibility of eyewitness identifications, *see State v. Waites*, 158 Wis. 2d 376, 383–84, 462 N.W.2d 206 (1990); *Hampton v. State*, 92 Wis. 2d 450, 465, 285 N.W.2d 868 (1979)(Abrahamson, J., concurring); Wis JI—Criminal 141 (1991).

that shortly after the robbery, she gave the police the following description of the robber: African-American male, at least six feet tall, wearing a white golfer's cap and tan jacket. This description was presumably given at a time when the eyewitness would have retained the sharpest image of the robber. The description offered no detail about the robber's facial features, coloring, build, age or other distinguishing characteristics. The description could fit many African-American men.

¶ 34. Although the eyewitness testified that she told Officer Wortock that the robber was at least six feel tall, Officer Wortock testified that the eyewitness merely told him that the robber was taller than she. The eyewitness is five feet tall. Thus the eyewitness and Officer Wortock offered conflicting accounts of her description of the robber's height.

¶ 35. Testimony about the eyewitness's recollection of the robber's facial hair varied. The eyewitness first testified that she knew the robber had long sideburns but was not sure if he had a mustache or beard; she later testified that she did not notice any facial hair on the robber. Officer Wortock first testified that the eyewitness informed him that the robber did not have facial hair; Wortock then testified that she did not say one way or another whether the robber had facial hair; still later, Wortock testified that he did not recall whether he had specifically asked her if the robber had facial hair. The defendant's niece testified that the defendant, on or around the date of the robbery, had a goatee and full mustache. Officer Bell saw the defendant four days before the robbery and at that time the defendant had full facial hair.

¶ 36. Thus the eyewitness's descriptions of the robber varied, and a significant discrepancy exists between the eyewitness's initial description of the rob-

171

ber and the defendant's actual appearance. The eyewitness's inconsistent statements about the robber's facial hair, the discrepancy between the initial description of the robber and the defendant's actual appearance, together with the minimal description furnished by the eyewitness, cast doubt on the eyewitness's ability to make an in-court identification independent of the unconstitutional lineup.

¶ 37.  The third *Wade* factor considers whether the witness identified any other person prior to the lineup. The defendant argues that the eyewitness's request that another man in the lineup step forward constitutes a prior identification. This argument, however, is untenable. The eyewitness testified that she asked the other man to step forward so she could get a better look at him. She never identified him as the robber. Witnesses participating in a lineup identification should be encouraged to examine carefully all participants to ensure an accurate identification. The fact that the eyewitness did not identify any other person as the robber supports the conclusion that the eyewitness's observation of the robber at the robbery would enable her to identify the defendant independent of the unconstitutional lineup.

¶ 38.  The fourth *Wade* factor is whether the witness identified the accused's photograph from a photo array prior to the lineup. The fifth *Wade* factor is whether the witness failed to identify the accused on occasions prior to the in-court identification. In this case, the two factors are interrelated. The eyewitness failed to identify the defendant in photographs she viewed on the day of the robbery. Ordinarily, a witness's failure to identify an accused from a photograph only hours after the crime might demonstrate that the witness's in-court identification of the accused was not

independent of an illegal lineup. However, in this case, the eyewitness's failure to identify the defendant's photo is of limited significance. The eyewitness testified that looking at a photograph is different from looking at the person. Furthermore, the circuit court found that the defendant's photograph did not bear a reasonable resemblance to his appearance in the courtroom and was therefore misleading enough to preclude the eyewitness from accurately identifying him as the robber.

¶ 39. The sixth *Wade* factor provides that a court consider the impact of the time lapse between the crime and the lineup identification. The longer the time between the initial observation and the lineup, the greater the likelihood that the initial observation at the crime will have dimmed and that the second image from the lineup will play an important role at the in-court identification. The robbery in the present case occurred on December 3, 1994, and the lineup identification occurred about five weeks later on January 9, 1995. The five-week period between the robbery and the lineup was arguably long enough to obscure the eyewitness's memory of her brief encounter with the robber at the time of the robbery and to increase the importance of her having seen the defendant in the lineup.

¶ 40. The seventh *Wade* factor addresses those considerations which, despite the absence of counsel, are disclosed concerning the conduct of the lineup. The conduct of the lineup may have a bearing upon whether the in-court identification is independent of the lineup or tainted by it. In this case, the police failed to take a photograph or a video of the lineup. The record contains photographs of the men in the lineup but does not disclose when the photographs were taken. Thus, the

only information we have about the physical staging of the lineup comes from the testimony of Investigator Long, Corporal Stratman and the eyewitness.

¶ 41.    The law enforcement officers testified that all the men in the lineup were similar to the defendant in terms of race, size, height, age and facial hair. The State asserts that using men who had facial hair demonstrates the fairness of the lineup. The defendant argues that staging the lineup using only men with facial hair suggested to the eyewitness that the robber had facial hair.

¶ 42.    Although both the State's and the defendant's interpretations of the lineup are reasonable and the circuit court found that the lineup was not unduly suggestive, we are mindful of the concerns the United States Supreme Court expressed in *Wade* about "the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification." *Wade*, 388 U.S. at 235. Considering the dangers described by the Court, we conclude that the physical staging of the lineup may have affected the eyewitness's memory of the robber by adding the detail of facial hair, a detail not present in her initial description. As the Court stated in *Wade*, "[s]uggestion can be created intentionally or unintentionally in many subtle ways. . .and increase[s] the dangers inhering in eyewitness identification." *Wade*, 388 U.S. at 229. The lineup, although not suggestive, and properly administered except for the absence of counsel, in this case could have crystallized the eyewitness's identification of the defendant for future reference because of the facial hair.

¶ 43.    After examining the seven factors set forth in *Wade*, we conclude that the State has not demon-

strated by clear and convincing evidence, as *Wade* requires, that the in-court identification had an origin independent of the lineup or was " 'sufficiently distinguishable to be purged of the primary taint.' " *Wade*, 388 U.S. at 241. The eyewitness's opportunity to observe the robber was limited to, at most, 25 seconds; she had never seen the robber prior to the robbery; she gave a general description of the robber; there was a discrepancy between her description of the robber immediately after the robbery and the defendant's actual physical appearance; there was a lapse of five weeks between the robbery and the lineup identification.

¶ 44. The State asks the court to consider another factor in addition to the seven *Wade* factors, namely the witness's level of certainty in making the in-court identification. The eyewitness in this case said at the suppression hearing that she was positive the defendant was the robber and that she would be able to identify him even if he had not been in the lineup and she had seen him on the street. The State argues that a witness's certainty in making an in-court identification is a proper factor for determining whether an in-court identification is independent of a tainted lineup.

¶ 45. This "certainty" factor is not mentioned in *Wade* but is set forth in *Neil v. Biggers*, 409 U.S. 188, 199 (1972). In *Biggers*, 409 U.S. at 201, the Court upheld the admission of testimony concerning a show-up identification by a witness who had been raped several months earlier.[10] The *Biggers* Court promulgated

---

[10] A show-up is a pre-trial, out-of-court identification procedure in which a suspect is viewed by a witness or victim of a crime. A show-up commonly occurs within a short time after a crime or under circumstances which would make a lineup impracticable or impossible.

a "totality of circumstances" test for trial courts to apply in evaluating the reliability of pre-trial, out-of-court identifications.

¶ 46. The "totality of circumstances" test includes five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199–200. Thus the *Biggers* "totality of circumstances" test overlaps to a large extent with the factors set forth in the *Wade* "independent origin" test.

¶ 47. Judges differ about whether to treat the *Wade* and *Biggers* tests as functionally equivalent.[11] We conclude that notwithstanding the similarity of the

---

[11] For opinions treating the two tests as functionally equivalent, see, *e.g., Solomon v. Smith*, 645 F.2d 1179, 1188 (2nd Cir. 1981) ("The tests of 'independent origin' set forth in *Wade* appear to be functionally identical to the reliability tests articulated in *Neil v. Biggers*"); *Graham v. Solem*, 728 F.2d 1533, 1549 (8th Cir. 1984) (McMillian, J., dissenting), *cert. denied*, 469 U.S. 842 (1984) ("concepts of 'purged taint' and 'independent origin' have been blended into, and superseded by, the two-step process of weighing reliability against suggestiveness articulated in *Biggers*"). The Wisconsin Judicial Benchbook lists level of certainty as to identification as a factor. 1 Wisconsin Judicial Handbook: Criminal and Traffic CR14–4 (1992).

For opinions treating the two tests as distinct, see, *e.g., United States v. Batista Ferrer*, 842 F. Supp. 40, 42 (D. Puerto Rico 1994) (stating that *Biggers* relates to an accused's due process rights, rather than the Sixth Amendment right to counsel); *Webster v. State*, 474 A.2d 1305, 1316 (Md. 1984) (concluding that independent origin test and totality of circum-

two tests, they are not functionally equivalent, and the *Biggers* "certainty" factor should not be included in the *Wade* test.

¶ 48. The *Wade* and *Biggers* tests are derived from different constitutional amendments and are intended to achieve different purposes. The *Wade* test focuses on the Sixth Amendment right to counsel at post-indictment lineups and on the exclusionary remedy for a constitutional violation of the Sixth Amendment. The *Wade* test is used to exclude evidence tainted by an unconstitutional lineup. Exclusion of derivative evidence is intended to deter unlawful police conduct and preserve judicial integrity.

¶ 49. The inquiry in *Biggers*, on the other hand, evaluates the reliability of a pre-trial identification when it is claimed that the pre-trial identification was made under impermissibly suggestive circumstances. *Biggers* uses a witness's certainty at a suggestive pretrial identification procedure to measure the reliability of the witness's identification *in that procedure*. *Biggers* is based on due process considerations, not on a Sixth Amendment violation or the *Wong Sun* exception to the fruit of the poisonous tree doctrine. Under *Biggers*, the "totality of the circumstances" test is applied to determine whether a pre-trial out-of-court identification was unreliable as a matter of law.

¶ 50. The case at bar is a *Wade* case. The issue is not whether a witness's observation of a perpetrator of a crime or an in-court identification of an accused was reliable. The issue is whether a witness's observation of a perpetrator of a crime constitutes an independent source for that witness's in-court identification of an accused.

stances test derive from distinct constitutional guarantees, call for different standards and are separate and distinct).

177

¶ 51. The primary concern in a *Wade* case is whether an unconstitutional lineup tainted a subsequent in-court identification. In a *Wade* case, the degree of certainty displayed by a witness at an in-court identification is not relevant in determining whether the in-court identification is independent of a tainted lineup. As the *Wade* court stated, " '[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " *Wade*, 388 U.S. at 229.[12]

¶ 52. Considering all the evidence, we hold that the eyewitness's in-court identification in the case at bar should be suppressed because the State has not shown by clear and convincing evidence that the eyewitness's in-court identification of the defendant had an "independent origin," that is, that the source of the in-court identification was the eyewitness's observation of the robber during the robbery and was independent of a lineup that violated the defendant's Sixth Amendment right to counsel.

¶ 53. Accordingly, we reverse that part of the decision of the court of appeals admitting the in-court identification and remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

---

[12] The *Wade* Court quoted Glanville Williams & H.A. Hammelmann, *Identification Parades, Part I*, [1963] Crim. L. Rev. 479, 482.

*By the Court.*—The decision of the court of appeals is reversed in part, and the cause is remanded.

¶ 54. N. PATRICK CROOKS, J. (dissenting). I dissent because I conclude the State has met its burden of establishing, by clear and convincing evidence, that the in-court identification is based upon observations of the eyewitness independent of the line-up identification. I further conclude that the certainty of the eyewitness is an appropriate consideration when determining whether the in-court identification is admissible under *United States v. Wade*, 388 U.S. 218 (1967).

I.

¶ 55. My review of the record, in accordance with the factors set forth in *Wade*, leads me to conclude that the in-court identification is based on the eyewitness's observations at the time of the robbery, independent of the line-up identification.

¶ 56. The first *Wade* factor considers the witness's opportunity to observe the perpetrator at the scene of the crime. In this case, the robbery occurred in a well-lit environment, and the eyewitness was wearing her eyeglasses at the time. The video tape indicates that the eyewitness was within a few feet of and directly facing the robber. The cash register was on the counter directly between the eyewitness and the robber; therefore, the eyewitness did not turn away from the robber to retrieve the requested change. In fact, at no time did the eyewitness turn away from the robber, even when she eventually backed away from him. There was nothing obstructing the eyewitness's view, and the robber made no attempt to conceal his face.

The robber was the only individual in the store at the time of the robbery, and there is no evidence that the eyewitness was otherwise distracted.

¶ 57.   Although the confrontation lasted approximately twenty seconds, courts have concluded that similar periods of time have provided witnesses with a sufficient opportunity to observe. *See United States v. Goodman*, 797 F.2d 468, 470 (7th Cir. 1986) (fifteen to twenty second observation); *United States v. Jarrad*, 754 F.2d 1451, 1455 (9th Cir. 1985) (three to four second observation), cert. denied, 474 U.S. 830 (1985); *Government of the Canal Zone v. Waldron*, 574 F.2d 283, 285 (5th Cir. 1978) (opportunity to view assailant twice, for two to three seconds on each occasion); *United States ex rel Phipps v. Follette*, 428 F.2d 912, 916 (2nd Cir. 1970) (twenty to thirty second observation), cert. denied, 400 U.S. 908 (1970). Furthermore, the time period is not the only element to consider in assessing whether the witness had a sufficient opportunity to observe. Rather, the time period must be considered within the context of the additional circumstances surrounding the confrontation. Based on the circumstances as they exist in this case, I conclude that the eyewitness had a sufficient opportunity to observe the robber.

¶ 58.   The second *Wade* factor considers any discrepancy between the eyewitness's pre-lineup description and the accused's actual appearance. In this case, there is no significant variance in the eyewitness's statements, and there is no discrepancy between her statements and the defendant's actual appearance.

¶ 59.   The eyewitness initially stated the robber had sideburns, but later testified she did not notice or did not know if the robber had facial hair. The significance of this factor is lessened when viewed in light of

the circumstances. In the video tape of the robbery, it is not apparent whether the robber did or did not have facial hair. It is apparent, however, that even if the robber had facial hair, it was neither voluminous nor lengthy.

¶ 60. Officer Wortock's testimony demonstrates no significant variance in the eyewitness's description of the robber's facial hair either. Officer Wortock consistently indicated that the eyewitness did not tell him whether or not the robber had facial hair. There may be some confusion because Office Wortock's initial testimony at the suppression hearing seemingly indicated that the eyewitness stated the robber did not have facial hair. However, Officer Wortock later clarified his testimony:

> Q . . .the victim in this case, indicated that the assailant did not have facial hair, correct. . .?
>
> A She did not say one way or the other.
>
> Q In your report. . .it indicates the following: The assailant in this incident did not have any facial hair. Was that not told to you by the [eyewitness]?
>
> A She did not say that to me. That was *my personal observation* from the video tape.
>
> Q And was it not, didn't you testify earlier today that she informed you that there was no facial hair on this [sic] assailant?
>
> A When she gave me a description of the party?
>
> Q Yes.
>
> A She did not say that the party had or had not any facial hair.

(R. 19 at 4–5.) (emphasis supplied.) Furthermore, Officer Wortock's failure to recall whether he directly

asked the eyewitness if the robber had facial hair provides no support for the contention that there is any variance in her description.

¶ 61. There is also no significant variation in the eyewitness's statements regarding the robber's height. The eyewitness testified that she described the robber as "at least six feet tall." (R. 18 at 11.) Officer Wortock testified that the eyewitness described the robber as "taller than her." (R. 27 at 12.) These statements vary somewhat but are consistent because the eyewitness is five feet tall. Thus, an individual who is taller than five feet could also be at least six feet tall. Furthermore, although the defendant's actual height is not noted in the record, there is no evidence that the eyewitness's statements create a discrepancy with the defendant's actual appearance.

¶ 62. Just as there is no significant variance in the description, there is no discrepancy between the description and the defendant's actual appearance. The majority finds compelling the testimony of the defendant's niece indicating the defendant had a goatee and full mustache on or about the date of the robbery, as well as Officer Bell's testimony that the defendant had facial hair approximately four days prior to the date of the robbery. This testimony does not evince a discrepancy.

¶ 63. The trial court made no findings of fact regarding the defendant's actual appearance on the date of the robbery. Facial hair is an easily modifiable physical feature, and the defendant may or may not have had facial hair on the date of the robbery. The majority's conclusion that a discrepancy exists assumes as true the defendant's niece's testimony that the defendant had facial hair on or about the date of the robbery. This is an improper assumption, as any issues

surrounding inconsistent witness statements implicate considerations of credibility and are issues to be resolved by the trier of fact. *See Boyer v. State*, 91 Wis. 2d 647, 672, 284 N.W.2d 30 (1979); *Kohlhoff v. State*, 85 Wis. 2d 148, 154, 270 N.W.2d 63 (1978). Even assuming *arguendo* that the defendant's niece's statements are true, it does not create a discrepancy because the eyewitness did not specifically state that the robber did not have facial hair.

¶ 64. The third *Wade* factor considers whether the witness identified any other individual prior to the line-up. The eyewitness in this case has not identified anyone other than the defendant as the robber.

¶ 65. The fourth *Wade* factor considers whether the witness identified the accused from a photo array prior to the line-up. As the majority notes, in this case the fourth *Wade* factor is closely related to the fifth *Wade* factor, which considers whether the witness failed to identify the accused prior to the in-court identification. The eyewitness did fail to identify the defendant from a photo array; however, the circuit court found the photo presented to the eyewitness was not a reasonable resemblance of the defendant. (R. 23 at 51.)

¶ 66. The sixth *Wade* factor considers the length of time between the date of the crime and the date of the line-up identification. I conclude the five-week period did not obscure the eyewitness's recollection. Courts have held that even a two- month lapse of time does not require suppression of an in-court identification where the witness does not identify an individual other than the defendant in the interim. *See United States v. Monks*, 774 F.2d 945, 957 (9th Cir. 1985); *United States v. Barron*, 575 F.2d 752, 755 (9th Cir. 1978). As previously noted, the eyewitness in this case

did not identify any individual other than the defendant as the robber.

¶ 67. The seventh *Wade* factor considers the facts disclosed relating to the conduct of the line-up. The line-up procedures were not suggestive in this case. The defendant was the suspect, and the defendant had facial hair at the time of the line-up. The additional men included in the line-up also had facial hair, just as they were also the same race and approximately the same size, height, and age as the defendant. It is reasonable that individuals with physical features similar to that of the defendant were included, so that attention was not inappropriately drawn to the defendant, and such procedures were not unduly suggestive. *See Messer v. Roberts*, 74 F.3d 1009, 1016 (10th Cir. 1996) ("men shown possessed sufficient similarities in size, coloration, height, complexion, hair color, full mustaches, somewhat receding hairlines, dress and weight to pass constitutional muster."). It is also not unduly suggestive that all individuals in the line-up had facial hair, even though the eyewitness's description did not include facial hair. *See United States v. Schoels*, 685 F.2d 379, 385 (10th Cir. 1982)(photo array of seven black men, all with noticeable facial hair, not unduly suggestive even though eyewitness described criminal as clean-shaven), cert. denied, 462 U.S. 1134 (1983). In addition, after reviewing the facts surrounding the line-up, the trial court determined the line-up procedures were not unduly suggestive. (R. 23 at 71.)

¶ 68. An analysis of the *Wade* factors under the circumstances as they exist in this case leads me to conclude that there is clear and convincing evidence that the eyewitness's in-court identification has an independent origin apart from the line-up identification.

184

## II.

¶ 69.  I also conclude that the certainty of a witness is a proper factor to consider in determining whether the in-court identification is independent of a tainted line-up identification. The "independent basis" test in *Wade* and the "totality of circumstances" test in *Neal v. Biggers*, 409 U.S. 188 (1972) are derived from different constitutional amendments; however, they are both premised on concerns of accurate and reliable witness identification.

¶ 70.  The *Biggers* test is derived from due process considerations and is primarily based upon the need to avoid the " 'very substantial likelihood of irreparable [eyewitness] misidentification.' " *Biggers*, 409 U.S. at 381 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Although the *Wade* test is derived from the Sixth Amendment right to counsel, the Court's concern in *Wade* was similarly that of "mistaken identification" and protecting the accused from pre-trial identification procedures replete with "innumerable dangers." *Wade*, 388 U.S. at 228.

¶ 71.  The Court's primary concern in *Wade* was not, as the majority argues, deterring unlawful police conduct and preserving judicial integrity. In fact, the *Wade* Court noted that "[w]e do not assume that these risks are the result of police procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification." *Wade*, 388 U.S. at 235.

¶ 72.  In assessing eyewitness identification, "[i]t is the reliability of identification evidence that primarily determines its admissibility." *Watkins v. Sowders*, 449 U.S. 341, 347 (1981). Numerous state and federal

courts have held that the level of certainty is relevant to a witness's reliability. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *United States v. Barron*, 575 F.2d 752, 755 (9th Cir. 1978); *State v. Figueroa*, 665 A.2d 63, 73 (Conn. 1995); *Shaw v. State*, 846 S.W.2d 482, 484 (Tex. Ct. App. 1993). Because the *Wade* and *Biggers* decisions are both premised on concerns regarding the reliability of witness identification, the certainty factor considered in *Biggers* is equally relevant in a Sixth Amendment *Wade* analysis.

¶ 73. The witness's certainty is particularly relevant where, as here, it is expressed within the context of the observations at the time of the crime. At the preliminary hearing in this case, the eyewitness identified the defendant during the prosecution's examination regarding the crime itself. Without waiver, the eyewitness positively identified the defendant as the man who asked her for change, pointed the knife at her, and robbed her. (R. 18 at 6–7.) Even more convincing was the eyewitness's testimony at the suppression hearing, wherein she stated she was "positive" and "one hundred percent" certain that the defendant was the armed robber. (R. 19 at 25.) The eyewitness additionally testified at the suppression hearing that she would be able to identify the defendant as the robber even if she saw him on the street, irrespective of the line-up. (R. 19 at 26.)

¶ 74. Undoubtedly, the majority would argue that the eyewitness's certainty at the preliminary hearing and the suppression hearing was irreparably tainted by the line-up identification. Yet, "[t]his difficulty has not prevented courts from finding sufficient certainty even when the evidence of certainty comes from confrontations that took place after the invocation

of suggestive procedures." *United States ex rel Kosik v. Napoli*, 814 F.2d 1151, 1159 (7th Cir. 1987).

¶ 75. The majority emphasizes the unreliable nature of eyewitness identification; however, the *Wade* test is utilized to remedy such concerns and combat any inherent unreliability. It cannot be discounted that eyewitness identification is relevant and extremely valuable to criminal convictions. Therefore, such identification evidence should not be hastily suppressed. As Justice Black noted in reference to testimony given by a criminally accused at a suppression hearing:

> The value of permitting the Government to use such testimony is, of course, so obvious that it is usually left unstated, but it should not for that reason be ignored. The standard of proof necessary to convict in a criminal case is high, and quite properly so, but for this reason highly probative evidence. . .should not lightly be held inadmissible.

*Simmons v. United States*, 390 U.S. 377, 397 (1968) (Black, J., dissenting).

¶ 76. The language of *Wade* indicates the factors enumerated were proffered as a guideline—not an all-inclusive list of factors to be utilized to the exclusion of any other relevant considerations. *See Wade*, 388 U.S. at 241. The extent of the witness's certainty would not be dispositive in a *Wade* analysis. Rather, it would merely be a factor to be considered in addition to those outlined in *Wade*. *See Biggers*, 409 U.S. at 199.

¶ 77. I conclude that a review of the record pursuant to *Wade* provides clear and convincing evidence that the eyewitness's in-court identification is independent of the line-up identification. The eyewitness had a sufficient opportunity to observe the robber; there was no discrepancy between the eyewitness's description

and the defendant's actual appearance; the eyewitness did not identify any other individual as the robber other than the defendant; the time period between the crime and the line-up did not obscure the eyewitness's recollection of the robber; the line-up procedures were not unduly suggestive. I further conclude that the certainty of the witness is a relevant and appropriate consideration when determining whether there is an independent basis for an in-court identification.

¶ 78.    For these reasons, I respectfully dissent.

¶ 79.    I am authorized to state that Justice DONALD W. STEINMETZ and Justice JON P. WILCOX join this dissent.