**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**November 9, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.** **2020AP1347-CR**

Cir. Ct. No. 2015CF5051

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

STEVEN TYRONE BRATCHETT,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: T. CHRISTOPHER DEE, Judge. *Affirmed.*

Before Donald, P.J., Dugan and White, JJ.

¶1 WHITE, J. Steven Tyrone Bratchett appeals his judgment of conviction for burglary, armed robbery, and attempted third-degree sexual assault, with various penalty enhancers and as a party to a crime. He also appeals the order denying his motion for postconviction relief. Bratchett argues that the trial court

erred when it concluded that the photo array by which the alleged victim identified him was sufficiently reliable and when it admitted a photo of Bratchett wearing prison orange, which he argued was unfairly prejudicial. He further argues that trial counsel was ineffective for failing to impeach the alleged victim with a prior statement, for failing to cross-examine the alleged victim about the photo identification procedures, for failing to object to the prosecutor's hypothetical statements in closing arguments, and for cumulative deficiencies. Finally, he asserts that the evidence was insufficient to convict him on the attempted third-degree sexual assault charge. We reject all of his arguments, and accordingly, we affirm.

## BACKGROUND

¶2　On November 15, 2015, S.D. reported to the Milwaukee Police that she had been robbed in her apartment near the Marquette University campus in Milwaukee. According to the criminal complaint, Bratchett and R.R.[1] knocked on S.D.'s door, and then forced their way inside, when Bratchett told S.D. that he would shoot her if she tried to close the door. Bratchett and R.R. took S.D.'s cell phone and bank card, then demanded her access code to withdraw funds. Bratchett told S.D. to go into her bedroom, to sit on the bed, and to take off her clothes. Bratchett "grabbed the bottom of the gym shorts that [S.D.] was wearing and he began 'tugging' on [S.D.'s] shorts." S.D. yelled at Bratchett and he told her that she "better not call the police." Bratchett and R.R. then left the apartment and then the building.

¶3　At the same time, Marquette University Police officers were searching S.D.'s apartment building because an officer had observed two individuals follow two female students into the building. Marquette University Police apprehended

---

[1] We refer to Bratchett's alleged co-actor, R.R., by his initials because he is a juvenile.

R.R. and discovered that S.D. had been robbed. Milwaukee Police were dispatched to investigate the robbery; in their search, the police recovered S.D.'s property that had been dropped near the apartment building. Police also recovered Bratchett's state photo identification card in the same location.

¶4 On November 21, 2015, Bratchett was charged with one count of burglary of a building or dwelling and one count of armed robbery, both counts as a party to a crime and with the habitual criminality repeater penalty enhancer. The case proceeded to trial and an amended information was filed, adding one count of attempted third-degree sexual assault by use of a dangerous weapon as a party to a crime.

¶5 Bratchett moved to suppress S.D.'s identification of him on the basis that the photo array used by the police was impermissibly suggestive; however, after a hearing, the trial court[2] determined it was sufficiently reliable and allowed in S.D.'s identification testimony.

¶6 The trial proceeded at the end of January 2017. The State's witnesses included S.D.; Marquette University Police officers and Milwaukee Police officers who investigated the robbery; the forensic investigator who testified about the recovery of S.D.'s property—including her wallet and bank card—and Bratchett's state photo identification card found near S.D.'s apartment building; and the latent fingerprint examiner who analyzed and identified a fingerprint pulled from S.D.'s recovered wallet as a match for Bratchett. The jury returned guilty verdicts for all three counts. Bratchett was sentenced to three consecutive sentences that totaled

---

[2] Bratchett's pretrial motions, trial, and postconviction motion were heard by the Honorable T. Christopher Dee; we refer to him as the trial court.

thirty-four years and six months, bifurcated as eighteen years and six months of initial confinement and sixteen years of extended supervision.

¶7    Bratchett moved for postconviction relief alleging claims of ineffective assistance of counsel. The circuit court conducted evidentiary hearings in August 2019 and January 2020.[3]  In August 2020, the trial court denied Bratchett's motion for postconviction relief.

¶8    Bratchett appeals. Additional facts are included in the discussion below.

## DISCUSSION

¶9    Bratchett's arguments fall into three categories:  trial court errors related to the admission of evidence; ineffective assistance of counsel; and sufficiency of the evidence. We address each in turn.

### I.    *Trial court errors*

¶10    First, Bratchett contends that the trial court erred when it concluded that S.D.'s identification of Bratchett in the photo array, while impermissibly suggestive, was reliable under the totality of the circumstances and admissible at trial. Second, Bratchett asserts that the trial court erred when it admitted and published to the jury his photo identification card, in which he was wearing an orange shirt that he argues showed that he was in prison. We conclude that the trial court did not err in either decision.

---

[3] The initial evidentiary hearing was conducted by the Honorable Michelle Ackerman Havas. The continued evidentiary hearing was conducted by the Honorable Jennifer R. Dorow.

## A. *Admissibility of S.D.'s identification of Bratchett*

¶11    A defendant's right to due process requires that identification evidence must have sufficient indications of reliability to be admitted. ***State v. Roberson***, 2019 WI 102, ¶3, 389 Wis. 2d 190, 935 N.W.2d 813. "The first inquiry is whether the out-of-court photographic identification was impermissibly suggestive, as to which the defendant has the burden. If this burden is not met, no further inquiry is necessary." ***State v. Mosley***, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981). If the defendant meets his burden, the burden shifts to the State to prove that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." ***Neil v. Biggers***, 409 U.S. 188, 199 (1972). When we evaluate the reliability of such an identification, we consider the ***Biggers*** factors, which include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

***Id.*** at 199-200.

¶12    Bratchett argues that S.D.'s identification was impermissibly suggestive and unreliable; therefore, he argues that the trial court erred when it did not suppress this testimony. The trial court heard Bratchett's motion to suppress prior to trial; S.D. testified that the entire robbery incident took about fifteen minutes—ten minutes in the kitchen and five minutes in her bedroom. She identified Bratchett as the older of the two men in her apartment. She recalled that Bratchett was wearing a "baggy sweatshirt"; she "could not see his hair" because "[h]is hood was up"; and he "kept putting his hand over his mouth when he talked."

She testified that Bratchett paced the floor in the kitchen and went "[w]ithin a foot of [her] face." She stated that she was five foot ten inches and that Bratchett was about the same height.

¶13 Trial counsel questioned S.D. about her identification of Bratchett from the photo array on November 16, 2015, in the early morning hours after the robbery:

> [TRIAL COUNSEL:] Now, when you were looking at those pictures, what made you say Mr. Bratchett?
>
> [S.D.:] I was—it was not a clear decision at all. I—I knew he was younger. He wasn't older, but I—I don't know. He just fit the description best, I guess, from my memory of what it looked like.
>
> [TRIAL COUNSEL:] Okay. And you did actually get a good look at him at some point, correct?
>
> [S.D.:] He was close to my face, but he kept moving his hands over his face. I was in shock.

S.D. testified that she was "sixty to seventy" percent sure that the photo she chose was the man who robbed her.

¶14 On cross-examination, the prosecutor questioned S.D. about the identification procedure when an officer met with her in her apartment:

> [PROSECUTOR:] And did he show each picture to you one at a time?
>
> [S.D.:] Yes.
>
> [PROSECUTOR:] And did he give you any preliminary instructions about how it was you were to review each picture?
>
> [S.D.:] I recall him just saying to study the picture and to pick which one best fits the description of what happened that night.

[PROSECUTOR:] Okay. Did he also tell you that potentially one of the six pictures would not include the person that was in your apartment?

[S.D.:] Yes.

….

[PROSECUTOR:] At any point in time did that officer then tell you, "Good job, you got him," or "You picked the right guy," or did he give any kind of name? Did he say anything?

[S.D.:] No.

¶15 S.D. testified that several days after she reviewed the photo array, a detective called her and she asked if she had picked the correct suspect and the detective confirmed that she had. S.D. testified that while she noticed the neck tattoo and facial moles on the photo in the identification array, she did not notice those features during the robbery on the face of the person in her apartment. She recalled that the person who robbed her had "a little bit wider of a face" and a "boxy" face, which she considered when she compared the photo of Bratchett to those of the other people in the identification array.

¶16 After S.D.'s testimony in the motion hearing, trial counsel argued that the identification should be suppressed because "none of the other individuals in the six-pack have … two moles … on their cheeks. None of them have a tattoo on their neck." Trial counsel stated that the police could have taken measures to remedy Bratchett's unique features, but they did not. The State acknowledged that it shared trial counsel's "concern about the six-pack" photo array. However, the State argued that S.D.'s testimony showed that the moles and tattoos were not factors in her identification of Bratchett, but what struck her was the "square jaw, the boxy face of Mr. Bratchett relative to the other guys."

7

¶17    The trial court stated:

> The initial burden is on the defense to indicate and to show that the photo array itself was impermissibly suggestive.
>
> I agree with both parties. That was my thought as well. I—you know, I think the officer made a good effort to try to find people who were of similar look. The hairstyles are the same. And the skin tone kind of goes back and forth, but there are gentlemen here of varying skin tones. Many of the things are very similar. So I think an honest effort was made. But you can't deny the fact that Photo No. 6 has a neck tattoo. No one else does. And that there were two moles … on the right side of his face, on the left side of the picture, that the other gentlemen in the photos don't have. So there is impermissible suggestiveness there.
>
> ….
>
> Now, in terms of the second step, if that is met the burden shifts to the State to show that despite the improper suggestiveness the identification was, nonetheless, reliable under the totality of the circumstances.
>
> ….
>
> Under the circumstances, I can't say that there was continued improper suggestiveness. In short, I think the State has met its burden to show that it wasn't otherwise— or to show that under the totality of the circumstances it's reliable to a point. And I'll explain that more.
>
> The mole, the neck tattoo are not significant aspects of [S.D.'s] identification. She mentioned a square jaw was, basically, about the only other distinguishing thing. And, I guess, looking at these pictures, No. 6 would have the most square of the jaw or boxy face, if you want to use that term. And I don't think at the point she was shown these photo arrays which, if I understood this correctly, happened hours after the incident.
>
> I don't think there was any continued impermissive suggestiveness, and I think she relied on factors that weren't a part of—if she had said, yeah, there was moles and a tattoo and all that, well, then we would have a real problem.

….

> Now, the tricky part comes in [S.D.'s] statements that her identification was 60 to 70 percent reliable. Well, I'll allow her, you know, what happened with this photo array.

¶18   A pretrial photographic identification violates a defendant's due process rights when it is "impermissibly suggestive and not otherwise reliable." *See Mosley*, 102 Wis. 2d at 649-50. Whether an out-of-court identification violates due process is a question of constitutional fact. *See Roberson*, 389 Wis. 2d 190, ¶66. A question of constitutional fact is a mixed question of fact and law, which requires us to engage in a two-part inquiry: we will uphold the trial court's findings of fact unless they are clearly erroneous, but we independently review whether those evidentiary facts satisfy the constitutional standard. *State v. McMorris*, 213 Wis. 2d 156, 165, 570 N.W.2d 384 (1997).

¶19   Bratchett argues that he met his burden to show that the identification was impermissibly suggestive and that the State failed to meet its burden to show that her identification was sufficiently reliable. Although the State argues that the identification was not impermissibly suggestive,[4] we agree with the trial court's analysis and we apply the *Biggers* factors to the facts and circumstances to determine whether the "likelihood of misidentification" requires suppression of the out-of-court identification because it violated his right to due process. *See Biggers*, 409 U.S. at 199.

---

[4] The State argues that Bratchett's photo did not stand out among the six suspects. Because this court may benefit from and draw upon the reasoning and observational advantage of the trial court, we decline to address this argument and instead adopt the trial court's position that the array was impermissibly suggestive. *See State v. McMorris*, 213 Wis. 2d 156, 165-66, 570 N.W.2d 384 (1997).

¶20    The first factor is the witness's opportunity to view the suspect. ***Id.*** The record reflects that S.D. testified that the suspect was in her apartment about fifteen minutes, he was about a foot away from her face, he was close enough to give her a clear view of his face, and she identified him based on her memory. Bratchett argues this factor does not support reliability because S.D. testified that the suspect wore a hood that obscured his hair style and that he kept his hand over his face for much of the encounter.

¶21    The second factor is the witness's degree of attention. ***Id.*** The record reflects that S.D. testified that she had a clear view of the suspect's boxy facial structure, but did not notice his moles or neck tattoo because of the hood of his sweatshirt covering his hair and his hands moving over his face. Bratchett asserts that shock and stress would reduce S.D.'s attention. The State argues to the contrary that the stress would sharpen her attention to detail.

¶22    The third factor is the accuracy of the witness's prior description of the suspect. ***Id.*** The record reflects that S.D. gave an initial description of the suspect that was recorded in a Milwaukee Police incident report; she described the suspects as two Black males, the first was in his early twenties and about five foot eight inches or nine inches, the second was in his teens. This description is limited, but S.D.'s later testimony does not contradict her prior description.

¶23    The fourth factor is the level of certainty demonstrated during the identification. ***Id.*** S.D. testified that the certainty of her identification was sixty to seventy percent. The record reflects that S.D. recalled the suspect's face being "boxy," but did not describe or rely upon his neck tattoo or the moles on his face to aid in her identification. The State argues that S.D.'s assessment of her certainty was candid, which supports the reliability of her identification.

¶24 The fifth factor is the time between the crime and the identification. *Id.* at 199-200. The record reflects that S.D. was shown the photo identification the next day—mere hours—after the robbery. The State argues that the short time period between the robbery and her identification to the police supports the reliability of the identification. Bratchett acknowledges that the timing may support the identification, but it is not dispositive of the issue of reliability.

¶25 We conclude that under the totality of the circumstances, the factors support that S.D.'s identification was reliable and not in violation of Bratchett's right to due process.[5] First, S.D.'s identification was based on her memory of the suspect's face under close observation during the robbery, and she acknowledged that the suspect wore a hooded sweatshirt that covered his hair and he kept his hand covering his face. S.D. noted the suspect's "boxy" face, but testified that she did not remember the suspect having facial moles and a neck tattoo and did not consider those features in her decision. Further, she testified her identification was sixty to seventy percent certain. The timing of the identification, which was made within the next day after the robbery, supports its reliability.

¶26 The trial court determined that under the totality of the circumstances, S.D.'s identification was reliable. The trial court observed S.D.'s testimony about her photo array identification of Bratchett, found her credible, and concluded that there were sufficient indicia of reliability to admit her testimony, which was subject

---

[5] Bratchett argues that the identification procedures were problematic under the Wisconsin Department of Justice's Model Policy for Eyewitness Identification for two reasons: first, S.D. testified that she was instructed to review each photo and "pick which one best fits the description of what happened that night"; second, the police confirmed S.D.'s identification of Bratchett. Both concerns support that the procedures around S.D.'s identification were impermissibly suggestive; however, neither issue disturbs our conclusion that the identification was nonetheless reliable under the totality of the circumstances.

to cross examination. We conclude that S.D.'s identification testimony was properly admitted.[6]

### B. Admission of Bratchett's state photo identification card

¶27 The decision to admit evidence is left to the discretion of the trial court, which we will uphold unless there was an erroneous exercise of discretion. *State v. Mayo*, 2007 WI 78, ¶31, 301 Wis. 2d 642, 734 N.W.2d 115. This court will sustain a decision to admit evidence if the court "examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a demonstrated rational process." *Id*. The question is not whether this court "would have admitted" the evidence, "but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record." *State v. Payano*, 2009 WI 86, ¶51, 320 Wis. 2d 348, 768 N.W.2d 832 (citation omitted). "The [trial] court's decision will be upheld 'unless it can be said that no reasonable judge, acting on the same facts and underlying law, could reach the same conclusion.'" *Id.* (citation omitted).

¶28 Bratchett concedes that the fact that the identification card was discovered in the police investigation was relevant for the purposes of WIS. STAT. § 904.01 (2019-20).[7] However, he asserts that the trial court erred to allow the jury to view the photo on the card because it was highly prejudicial under the meaning in WIS. STAT. § 904.03. *See Estelle v. Williams*, 425 U.S. 501, 504-05 (1976)

---

[6] If under the totality of the circumstances, there is not "'a very substantial likelihood of irreparable misidentification,'" then the "evidence is for the jury to weigh." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

[7] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

("[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment.").

¶29 The State argues that the only indication that Bratchett was wearing a prison uniform was the orange color of his shirt. The record reflects that the court concluded that there was no problem with the actual photo or that anything about prison was suggested by the clothing itself. Further, the court ordered the State to cover up Bratchett's address in Waupun, which might have prejudiced him by its association with the state prison.

¶30 We conclude that the trial court considered the relevant facts and tailored the presentation of the photo to avoid potential unfair prejudice from an address in a city with a well-known prison. The court considered the applicable standard of law and balanced the relevance of the evidence against unfair prejudice. The trial court then demonstrated rational decision-making and reached a decision that a reasonable court could reach. *See Payano*, 320 Wis. 2d 348, ¶51. We conclude that the court's admission of the photo identification card was a reasonable exercise of discretion.

## II. *Ineffective assistance of counsel*

¶31 Bratchett argues that counsel was ineffective in four areas: (1) S.D.'s description of Bratchett's statements during the attempted sexual assault; (2) the procedures and instructions surrounding S.D.'s identification of Bratchett in the photo array; (3) the prosecutor's hypothetical statements in closing argument; and (4) cumulative deficiencies.

¶32 To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the defendant was prejudiced

by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For the first prong, "[c]ounsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. For the second prong, the defendant must show prejudice by counsel's performance. *Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In our analysis, we "may reverse the order of the two tests or avoid the deficient performance analysis altogether if the defendant has failed to show prejudice" from counsel's performance. *See State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶33    Bratchett received two *Machner*[8] hearings on his claims of ineffective assistance of counsel. After both hearings, the trial court issued a single written decision denying all of his claims. First, the trial court concluded that trial counsel's failure to attempt to impeach S.D. with prior statements with regard to the sexual assault was "part of the overarching defense strategy … to attack the sufficiency of the identification" of the suspect. Second, the trial court concluded that trial counsel operated with a "legitimate strategy" to focus on the reliability and confidence level of S.D.'s identification rather than concerns about the procedural instructions or confirmation of the identification. Third, the court concluded that trial counsel's failure to continue to object to the prosecutor's "hypothetical" argument in closing argument or failure to request a mistrial did not result in lack of confidence in the outcome because trial counsel's "explanation of his thought process appears solidly

---

[8] *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

based given the totality of the circumstances[.]" Finally, the court concluded that even viewed cumulatively, any errors by trial counsel were not "sufficient to undermine confidence in the outcome." The trial court decided that Bratchett failed to prove deficiency and prejudice on any claim and denied his motion for relief.

### A. S.D.'s description of Bratchett's statements during the attempted sexual assault

¶34 Bratchett argues that trial counsel failed to cross-examine and impeach S.D. on the inconsistencies between her statements made to the police and her testimony at trial. In the criminal complaint, S.D. reported that during the robbery, Bratchett said to her, "Are you lying to me, you better not be lying to me, don't fuck with me." At trial, S.D. testified that Bratchett said to her, "'I will fuck you. You better not be lying to me.'" At the August 2019 *Machner* hearing, Bratchett's postconviction counsel questioned trial counsel on failing to question S.D. about the difference in those statements.

> [POSTCONVICTION COUNSEL:] So did you have a strategic reason for not impeaching [S.D.] with this inconsistent statement during her testimony?
>
> [TRIAL COUNSEL:] I don't recall if I did or did not. What I did I believe, and you have the transcripts of this, I talked about Mr. Bratchett, was he aroused at any point, did he expose himself to you, that's how I attacked it.
>
> ….
>
> That other stuff, I don't know if that was her stating to the police and the police getting it wrong or vice versa, so I couldn't tell.
>
> ….
>
> [POSTCONVICTION COUNSEL:] [Y]ou did not use this statement in your cross examination because you could not be clear as to whether it was a mistake … on the

15

police's part, is that a good summation of what you're saying here?

[TRIAL COUNSEL:] Yeah.

[POSTCONVICTION COUNSEL:] Obviously, you would agree that identification was an issue in this trial, correct?

[TRIAL COUNSEL:] Correct.

¶35     Bratchett argues that trial counsel was ineffective for failing to impeach S.D. with her description of Bratchett's statement from the criminal complaint because it would have created doubt about S.D.'s credibility and it would have undermined the State's evidence of unequivocal intent to commit sexual assault. Bratchett contends that without evidence of his express intent to commit sexual assault, the State's evidence of intent rested on Bratchett pulling on S.D.'s shorts—an action that is ambiguous under Bratchett's reasoning. Bratchett argues that trial counsel's failure to pursue this line of questioning undermines confidence in the verdict.

¶36     At the August 2019 *Machner* hearing, trial counsel explained that his strategy not to attempt to impeach S.D.'s statements was two-fold: there was a risk that the police report was inaccurate[9] and instead, focusing on S.D.'s sixty to seventy percent certainty in her identification of the suspect. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "This court will not second-guess a reasonable trial strategy, but this court may conclude that an attorney's performance was deficient if it was based on an 'irrational trial tactic' or 'based upon caprice rather than upon judgment.'" *State v. Domke*, 2011 WI 95,

---

[9] Bratchett asserts that trial counsel would not have lost standing or credibility with the jury if the police report had been inaccurate and he had unsuccessfully attempted to impeach S.D. We conclude that Bratchett's argument fails to show deficient performance.

¶49, 337 Wis. 2d 268, 805 N.W.2d 364 (citation omitted). Trial counsel's strategy was not irrational. In trial counsel's opening argument, he set forth a theory of defense that Bratchett "denie[d] being in the apartment at any time. He denie[d] committing any of these crimes." Under the theory that Bratchett was not the suspect and focusing on S.D.'s less than 100% confidence in her identification, S.D.'s recollection of the precise wording employed by the suspect would not have aided in his defense. We conclude that Bratchett has failed to show that trial counsel's performance was deficient.

¶37 We conclude that trial counsel's failure to impeach S.D.'s testimony for inconsistency with the criminal complaint was not deficient performance, and thus not ineffective assistance of counsel, because declining to impeach S.D. was part of a reasonable trial strategy. *See State v. Breitzman*, 2017 WI 100, ¶74, 378 Wis. 2d 431, 904 N.W.2d 93. Because we conclude that Bratchett has not established that trial counsel's performance was deficient, we need not address whether, in the context of ineffective assistance of counsel, the alleged error prejudiced Bratchett, and we decline to do so. *Id.*, ¶81.

### B. Procedural issues with S.D.'s identification of Bratchett

¶38 Bratchett argues that trial counsel failed to impeach the integrity of S.D.'s identification of Bratchett in the six-pack photo array identification. Bratchett contends that S.D.'s testimony at the identification suppression hearing raised two "red flags": that S.D. had been instructed to pick out the individual who

"best fits" her recollection of the suspect,[10] and that S.D. was given confirmation that she picked out the correct person. He contends that the photo identification procedure was flawed because S.D. was instructed to use "relative judgment" when she reviewed the photos and that the police confirmed her choice, both of which violated the Model Policy and Procedure for Eyewitness Identification from the Wisconsin Department of Justice.

¶39 At trial, trial counsel cross-examined S.D. about the accuracy of her identification, reviewing how much light was in the apartment, her opportunity to see the suspect's face completely because of his hand moving over his face, and her identification of Bratchett in the photo array:

> [TRIAL COUNSEL:] And when you conducted the photo array … you took your time, right?
>
> [S.D.:] Yes.
>
> [TRIAL COUNSEL:] You wanted to get it right, correct?
>
> [S.D.:] Yes.
>
> [TRIAL COUNSEL:] You didn't want to see anyone that should not go to jail, go to jail, correct?
>
> [S.D.:] Correct.
>
> [TRIAL COUNSEL:] You want the person that should go to jail to go to jail, correct?
>
> [S.D.:] Yes.

---

[10] We note that S.D.'s testimony actually stated that she was instructed by police "to study the picture and to pick which one best fits the description of what happened that night." Further, S.D. testified that she was told that the suspect might not be among the photos at all. To assert as Bratchett does that S.D. was told to choose the photo that "best fits" the suspect mischaracterizes the record.

> [TRIAL COUNSEL:] That person you thought should go to jail was, you're only sixty to seventy percent sure that was him?
>
> [S.D.:] Yes.
>
> [TRIAL COUNSEL:] That's about a forty percent chance you got it wrong?
>
> [S.D.:] Yes.
>
> ….
>
> [TRIAL COUNSEL:] What grade is sixty percent, is it near failing?
>
> [S.D.:] Yes.

¶40 At the August 2019 *Machner* hearing, postconviction counsel questioned trial counsel about his tactics during the hearing to suppress S.D.'s identification of Bratchett prior to trial.

> [POSTCONVICTION COUNSEL:] So if [S.D.] stated during that motion hearing … that she was told that she was supposed—or that she understood the process to be that she wanted to pick the one who best fit the suspect, did you have a strategic [reason] for not cross examining during the trial about that instruction or her understanding of that instruction?
>
> [TRIAL COUNSEL:] Not as it is here. I went over the fact that she was 70 percent sure, I did cross examine her on that.
>
> ….
>
> [POSTCONVICTION COUNSEL:] [T]he fact that she was explicitly told to pick the person who looked most like the suspect, that wasn't something that you thought you should bring to the jury's attention?
>
> [TRIAL COUNSEL:] No, I guess not.
>
> [POSTCONVICTION COUNSEL:] And what was your strategic reason for not doing that?

19

[TRIAL COUNSEL:] Because I—again, I was attacking the fact that she was 70 percent sure that this was the suspect, not 100 percent sure that it was the suspect.

[POSTCONVICTION COUNSEL:] And so that would go to the reliability of her eyewitness identification.

[TRIAL COUNSEL:] Yes.

¶41 Bratchett argues that trial counsel demonstrated an unreasonable trial strategy when he testified at the August 2019 *Machner* hearing that his strategy was to attack the reliability and confidence of S.D.'s identification rather than the "best fits" instruction. Because Bratchett's trial defense was based on the idea that Bratchett was not present during the crime, trial counsel's strategy of undermining the jury's confidence in S.D.'s identification was not irrational or capricious. We conclude that trial counsel's failure to question S.D. about the identification procedures was not deficient performance, and thus, not ineffective assistance of counsel, because focusing on S.D.'s sixty to seventy percent confidence in her identification was part of a reasonable trial strategy. *See Breitzman*, 378 Wis. 2d 431, ¶74.

¶42 Additionally, Bratchett argues that trial counsel was deficient for failing to question S.D. about the police confirmation of her identification of Bratchett as the suspect. The State argues that there is no evidence in the record to support that it increased her confidence in her identification. We agree. The record reflects that the police did not confirm her choice during the identification process, but did so a couple of days later.

¶43 Even if we assume that trial counsel's performance was deficient not to pursue this point, we conclude that Bratchett has failed to show that raising the concern about the identification confirmation would have caused a reasonable possibility of a different outcome at trial. As the trial court noted in its decision,

when the confirmation issue was considered "in the context of the entire trial," it did not prejudice Bratchett. *See Mayo*, 301 Wis. 2d 642, ¶43. The State presented a plethora of evidence to prove Bratchett's guilt including: Bratchett's fingerprint being identified on S.D.'s wallet that was stolen and recovered after the robbery, Bratchett's state photo identification card that was found with S.D.'s stolen property not far from S.D.'s apartment after the robbery, and a Marquette University Police officer testified to observing a juvenile and a "male in a light sweat suit" with a hood covering his head following two female students toward S.D.'s apartment building. We conclude Bratchett's claim of ineffective assistance of counsel based on the procedures surrounding S.D.'s identification of Bratchett in the police photo array fails by not demonstrating that counsel's performance was deficient or prejudicial.

### C. Failure to continue to object to closing arguments or to request a mistrial

¶44 Bratchett argues that trial counsel was ineffective in his response to the State's closing argument. During its closing argument, the State argued that the defense strategy tried to "explain away all this evidence," but that was "an attempt to divert your attention."

> [PROSECUTOR:] What about this and what about that? That's a common defense theme. What about this? What about that? It's like, oh, well, my client, he admitted to the crime in a Mirandized statement.
>
> [TRIAL COUNSEL:] Objection. That's a fact not in evidence.
>
> [PROSECUTOR:] Hypothetically.
>
> THE COURT: Sustained.
>
> [PROSECUTOR:] Hypothetically, the defense thought, well, he admitted to the crime. It's not audio recorded. Well, if it's audio recorded, well, then it's not videotaped. Well, if it's videotaped, well, then where's the

written signed confession? See, it never ends. It's always something more. You're missing this. You're missing that.

¶45     At the August 2019 *Machner* hearing, postconviction counsel reviewed the State's "hypothetical" argument made after the defense objection was sustained.

> [POSTCONVICTION COUNSEL:] You obviously objected to the first argument but not the second, correct?
>
> [TRIAL COUNSEL:] Correct.
>
> [POSTCONVICTION COUNSEL:] Did you have a strategic reason for not objecting to the second portion of argument there?
>
> [TRIAL COUNSEL:] Yes.
>
> [POSTCONVICTION COUNSEL:] What was the strategic reason?
>
> [TRIAL COUNSEL:] In a closing argument, I think the more you object, the more the jury is drawn to those statements. I objected once and I moved on.

¶46     Bratchett contends that trial counsel's strategy was unreasonable because the objection was meritorious, counsel had been sustained once, and having objected once, it was absurd for counsel to assert that he was afraid of calling attention to the argument. Bratchett asserts that because the State created the impression that a confession existed and had been withheld, the fairness of the trial was tainted. Bratchett argues that trial counsel's failure to move for a mistrial prejudiced his defense because the imagined "withheld confession" may have resolved any doubts about the circumstantial evidence and S.D.'s sixty to seventy percent certainty in her identification.

¶47     We again note that trial counsel expressed a reasonable trial strategy to avoid highlighting the State's argument through continued objections. Following

the objection being sustained by the trial court, the State posited its argument in a hypothetical form. The State argues that this accomplished the point of the objection. However, even if it were deficient, when we consider trial counsel's failure to continue to object or to move for a mistrial "in the context of the entire trial," we conclude trial counsel's performance did not prejudice Bratchett. *See Mayo*, 301 Wis. 2d 642, ¶43. "Even if there are improper statements by a prosecutor, the statements alone will not be cause to overturn a conviction." *Id.* As discussed above, the State presented a plethora of evidence to prove Bratchett's guilt. Further, trial counsel's attempt to avoid the jury focusing on that argument was part of a reasonable trial strategy. *See Breitzman*, 378 Wis. 2d 431, ¶74. We conclude that Bratchett's claim for ineffective assistance of counsel fails because he has not demonstrated counsel's performance was deficient or his performance prejudiced his defense.

### D. Cumulative deficiencies

¶48    Bratchett argues that the cumulative deficiency of trial counsel's performance prejudiced his defense by undermining our confidence in the jury's verdict. "[T]he cumulative effect of several deficient acts or omissions may, in certain instances, also undermine a reviewing court's confidence in the outcome of a proceeding." *Thiel*, 264 Wis. 2d 571, ¶60. This court may consider "the effects of multiple incidents of deficient performance in determining whether the overall impact of the deficiencies satisfied the standard for a new trial under *Strickland*." *Thiel*, 264 Wis. 2d 571, ¶60. Bratchett contends that competent counsel could have shifted the trial by undermining S.D.'s identification and protecting the jury from this improper argument.

¶49 Bratchett argues that the State's evidence failed to conclusively establish Bratchett's guilt; however, he merely presents a laundry list of imperfections.[11] *See id.*, ¶61 ("[A] convicted defendant may not simply present a laundry list of mistakes by counsel and expect to be awarded a new trial. A criminal defense attorney's performance is not expected to be flawless."). Further, Bratchett argues that there was evidence that his photo identification card, which was found near S.D.'s recovered property, had been in the possession of his younger brother that night.[12] Bratchett contends there were grounds for skepticism about the fingerprint that was presented because of the small number of "points" used to declare a match and the Automated Fingerprint Identification System database did not match the print as Bratchett's, even though he had been previously arrested and his fingerprints were most likely in the system. However, skepticism does not show that any of these supposed errors prejudiced Bratchett's defense. Having concluded above that Bratchett's three individual arguments did not demonstrate deficiency by trial counsel, this additional list of concerns does not prove that counsel was ineffective.

¶50 When this court considers errors by trial counsel, "each alleged error must be deficient in law—that is, each act or omission must fall below an objective

---

[11] Bratchett's concerns include that the State did not present any citizen witnesses, did not introduce any relevant surveillance footage, did not obtain a confession, and did not inform the jury if Bratchett's alibi had been disproven. Further, he complains that Bratchett's co-actor did not testify against him; that there was no fingerprint evidence from S.D.'s apartment; that although two police officers testified that they each saw a suspicious man on the night of the robbery, neither could identify Bratchett; and that S.D. described the suspect's sweatshirt as gray, while one of the police officer's testified it was white.

[12] At the August 2019 *Machner* hearing, trial counsel testified that he did not pursue the brother's possession of the card because "it would be hard for a jury to believe that [Bratchett's much younger brother] committed all these crimes himself," and the fact that they were brothers "would put Mr. Bratchett closer to the scene than further away." We conclude that is a reasonable trial strategy.

standard of reasonableness—in order to be included in the calculus for prejudice." *See id.* Here, the errors alleged do not fall below an objective standard of reasonableness. Bratchett relies on omissions in the State's presentation of the case; however, he fails to allege what trial counsel failed to investigate and present. Our confidence in the outcome of the trial is not undermined whether we view the allegations of error individually or cumulatively. Therefore, each of Bratchett's claims of ineffective assistance of counsel fails.

### III. *Sufficiency of the evidence*

¶51 Bratchett argues that the evidence does not establish that he had intent to have sexual intercourse with S.D. without her consent. He contends that the State's evidence was ambiguous whether the suspect was threatening to harm S.D. or rape her, evidence that included ordering S.D. to sit on the bed and disrobe, pulling on the waistband of S.D.'s shorts, and using the word "fuck." Bratchett argues that S.D.'s testimony showed that the suspect did not expose himself or make an affirmative sexual gesture toward her, either of which would show unequivocal intent to commit sexual assault or rape rather than a threat of non-sexual harm. He argues that the threats may have been made to frighten her into compliance and the order to disrobe may have delayed her from seeking help.

¶52 "The question of whether the evidence was sufficient to sustain a verdict of guilt in a criminal prosecution is a question of law," which we review independently. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. In reviewing the sufficiency of the evidence to support a conviction, we may not substitute our judgment for that of the trier of fact unless the evidence, viewed most favorably to the verdict, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found the requisite guilt. *See State v. Poellinger*,

153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). If more than one reasonable inference can be drawn from the evidence, we must adopt the inference that supports the verdict. *See id.* at 506-07. We "will uphold the conviction if there is any reasonable hypothesis that supports it." *Smith*, 342 Wis. 2d 710, ¶24.

¶53    The elements of attempted third-degree sexual assault as a party to a crime[13] are broken down into the attempt, for which the State had to prove that Bratchett "did acts towards the commission of the crime … which demonstrate[d] unequivocally, under all of the circumstances, that [he] intended to and would have committed the crime except for the intervention of another person, or some other extraneous factor," and the commission of the attempted crime, here, third-degree sexual assault, which has two elements: sexual intercourse and lack of consent to sexual intercourse. *See* WIS JI—CRIMINAL 580; WIS JI—CRIMINAL 1218A.[14]

---

[13] Because Bratchett was not convicted of using a dangerous weapon to carry out the sexual assault charge, we do not discuss the elements required to prove that element.

[14] The trial court instructed the jury on these elements for count three as well as provided the following relevant definitions:

> "Sexual intercourse" means any intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening of another. Emission of semen is not required.

> "Did not consent" means that [S.D.] did not freely agree to have sexual intercourse with Mr. Bratchett. In deciding whether [S.D.] did not consent, you should consider what she said and did, along with all other facts and circumstances. This element does not require that [S.D.] offered physical resistance.

> ….

Bratchett argues that the State's evidence is insufficient to prove the element of attempt beyond a reasonable doubt. We focus our analysis on this element.

¶54 Our task in reviewing a claim of insufficient evidence is to consider the facts in the light most favorable to the verdict and only overturn the verdict if no fact finder could have reached this conclusion. *See Poellinger*, 153 Wis. 2d at 507. In our examination of the record, we conclude that there was sufficient evidence for a reasonable jury to reach a guilty verdict on the attempted third-degree sexual assault charge. S.D. testified that Bratchett "started leading [her] and told [her] to walk into [her] room," where he then told her to "sit down" on her bed, while he stood directly "in front of [her]." She testified that Bratchett then told her, "Take off your clothes" and to "move back on the bed" and to be "seated directly in the middle of the bed," which caused her to lift her feet so they "were no longer touching the floor." S.D. testified that when Bratchett grabbed a fistful of her gym shorts "by the waistline" using "his fist, all five fingers" of his right hand, she "placed both [of her] hands on [her] shorts on either side," and told him, "No, you're not doing that. I'm not doing that." S.D. testified that in response, Bratchett said, "I will fuck you. You better not be lying to me," which she testified that she interpreted to mean "he was going to rape" her. S.D. testified that Bratchett then walked away, and he kept saying, "You better not be lying to me" and he kept bringing up whether she had

"Unequivocally" means that no other interference [sic] or conclusion can reasonably and fairly be drawn from Mr. Bratchett's acts under the circumstances. "Another person" means anyone but Mr. Bratchett and may include the intended victim. An "extraneous factor" is something outside the knowledge of Mr. Bratchett or outside Mr. Bratchett's control.

You cannot look into a person's mind to find intent. Again, intent must be found, if found at all, from Mr. Bratchett's acts, words, and statements, if any, and from all the facts and circumstances in this case bearing upon intent.

access to any other phone, telling her that she better not call the police, or "I will come fuck you."

¶55 The record reflects that a jury could have found that Bratchett made acts that demonstrated his intent to sexually assault S.D., that his actions were unequivocal, and that his attempt was stopped by S.D.'s refusal. Further, the record reflects that S.D. expressly testified that she did not consent or intend to give consent to sexual intercourse with Bratchett. Therefore, a jury could have found that the elements of attempted sexual intercourse without consent were proven by the State beyond a reasonable doubt.

¶56 Bratchett argues that there are inferences that do not show an intent to commit sexual assault that could be made from Bratchett's words and actions; however, we are not called upon to speculate about alternate meanings of the evidence. There is sufficient evidence for the jury to have returned the guilty verdict on count three.

## CONCLUSION

¶57 We conclude that Bratchett has failed to show that the trial court erred when it concluded that S.D.'s identification testimony was reliable and did not need to be suppressed. Further, we conclude that Bratchett has failed to show that the trial court erred when it admitted the photo from Bratchett's state photo identification card, which showed him in an orange shirt. Additionally, we conclude that Bratchett's claims of ineffective assistance of counsel fail with regard to S.D.'s prior descriptions of Bratchett's statement, the procedures around S.D.'s identification of Bratchett, the State's closing argument, and cumulative deficiencies. Finally, we conclude that the State's evidence was sufficient to support Bratchett's conviction on count three.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.

¶58   DUGAN, J. (*dissenting*).  I write separately because I would grant Bratchett a new trial for two reasons.  First, I would conclude that S.D.'s identification of Bratchett during the photo array was impermissibly suggestive and that the State failed to prove that under the totality of the circumstances the identification was reliable.  Thus, the identification should have been excluded.  Second, I would conclude that Bratchett's trial counsel was ineffective for failing to cross-examine S.D. concerning her inconsistent statements as to what the subject said to her in the bedroom.  Because I would grant Bratchett a new trial on these grounds, I would not address the remaining issues raised on appeal.  Thus, I respectfully dissent.

## I.    Admission of S.D.'s Photo Array Identification

### A.    Applicable Law

¶59   Due process concerns can restrict the admission of evidence, and "'identification [evidence] infected by improper police influence' may be excluded when 'there is a very substantial likelihood of irreparable misidentification' unless, 'the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances.'"  *State v. Roberson*, 2019 WI 102, ¶26, 389 Wis. 2d 190, 935 N.W.2d 813 (citation and one set of internal quotations omitted).

¶60   The test to determine whether identification evidence should be excluded based on due process concerns is two-fold.  First, the defendant bears "an initial burden of showing that the identification procedure employed by law

enforcement was impermissibly suggestive such that there was a very substantial likelihood of misidentification." *Id.*, ¶34.  Second, if the defendant meets his burden, "the State must prove that 'under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.'" *Id.*, ¶35 (one set of internal quotations omitted).  The application of constitutional principles to the facts as found by the trial court is a question of law that is reviewed independently.  *Id.*, ¶66.

### B.     Analysis

¶61     Under the first step, the Majority adopts the trial court's conclusion as to the suggestiveness of the procedure used, Majority, ¶19 & n.4, and while I agree with the ultimate conclusion reached—that the procedure was impermissibly suggestive—I would conduct a more thorough investigation into the question to highlight precisely why the procedure used here was impermissibly suggestive and the State failed to prove that under the totality of the circumstances the identification was reliable.

¶62     At the hearing to determine the admissibility of S.D.'s identification of Bratchett during the photo array, S.D. testified that she was instructed by the police "to study the picture and to pick which one best fits the description" of the individual who entered her apartment that night.  While the prosecutor attempted to rehabilitate S.D.'s testimony with a follow-up question clarifying that the police additionally instructed S.D. that the individual may not be present in the photos she was being shown, I cannot agree that we can so easily gloss over S.D.'s testimony that she completed the photo array by choosing a photo that "best fits" the person who entered her apartment.  The only implication of the instruction to choose the

2

photo that "best fits" the description is that S.D. was expected to pick a photo, even if it was not the photo of the person she believed to have entered her apartment.

¶63　Moreover, S.D.'s testimony belies the importance she placed on this instruction to pick the best photo and the method she employed in selecting a photo as the one that "just fit the description best … from [her] memory of what it looked like." During cross-examination, trial counsel asked her, "[W]hen you were looking at those pictures, what made you say [] Bratchett?" S.D. responded, "I was—it was not a clear decision at all. I knew he was younger. He wasn't older, but I—I don't know. He just fit the description best[.]" Thus, despite the additional instruction that the subject's picture may not be in the array, S.D.'s testimony shows that she focused on the instruction to pick a photo that was the best fit.

¶64　Additionally, the photo of Bratchett stood out among the other photos and was not similar to the others because Bratchett's photo was the only photo where the individual had large moles on his right cheek, a sizeable neck tattoo, and an undeniable "boxy" face. *See Powell v. State*, 86 Wis. 2d 51, 67, 271 N.W.2d 610 (1978) (stating that a photo array was not impermissibly suggestive because "[a]ll the photos were similar in aspect"). Coupled with the police's instruction and S.D.'s resulting impression that she needed to select a photo, there is no doubt that this photo array was impermissibly suggestive. "Suggestiveness in photographic arrays may arise in several ways—the manner in which the photos are presented or displayed, the words or actions of the law enforcement official overseeing the viewing, or some aspect of the photographs themselves." *State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981).

¶65　Here, Bratchett's photo stood out among the other photos because it was the only photo with three clearly distinguishable features, and S.D. believed she

had to choose a photo based on the police instructions. When I reviewed the photos in the array, Bratchett's picture jumped out specifically because of how boxy his face appeared, whereas none of the other pictures even slightly appeared boxy. Thus, I would conclude that Bratchett has met his burden in this regard to show that the photo array was impermissibly suggestive and there was a very substantial likelihood of misidentification based on the manner in which the photo array was conducted.

¶66     Moving to the second step, the burden shifts to the State to prove that under the totality of the circumstances the identification was reliable and requires analyzing the totality of the circumstances. This requires an examination of a "nonexclusive list of reliability factors." *Roberson*, 389 Wis. 2d 190, ¶35. The factors include:

> (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the suspect, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.

*Id.* Here, I respectfully disagree with the Majority's analysis, and I would reach the opposite conclusion, namely that under the totality of the circumstances the identification that S.D. made during the photo array was unreliable and thus, should have been excluded.

¶67     Under the first factor, S.D. admitted that she "couldn't see much of his face" because the suspect had the hood of his sweatshirt covering his head and kept putting his hand over his mouth when he talked. While she also testified that the suspect was close to her face during certain portions of the encounter and the suspect was in her apartment for fifteen minutes, no amount of time or distance can erase the fact that the suspect attempted to shield his face from view, and those

4

attempts, which were successful based on S.D.'s subsequent testimony, leads me to conclude that this factor weighs against reliability.

¶68     Indeed, when the police subsequently asked S.D. for a description immediately following the incident, S.D. said she "couldn't completely see his face." S.D. was later questioned if she "did actually get a good look at him at some point," and she responded, "He was close to my face, but he kept moving his hands over his face. I was in shock." At only one point in her testimony does S.D. say she had a moment in the bedroom where she had a "clear view" of the suspect's face. A complete review of S.D.'s testimony, though, makes it obvious that the one brief moment in the bedroom where she says she had a clear view of the suspect's face, was not enough for her to have an opportunity to identify any distinguishing features because she missed the most obvious distinguishing features possible. Accordingly, I would conclude that this factor weighs in favor of excluding S.D.'s identification of Bratchett during the photo array.

¶69     The second factor leads me to a similar conclusion because S.D.'s degree of attention is questionable in this circumstance. She testified that she was in shock during the robbery, and she "wasn't focused on memorizing anything about their face." She also testified that she did not notice the two clearly distinguishing facial features of the defendant—the large moles on his right cheek and a sizeable neck tattoo—on the person who was in her apartment, but she did notice them on the defendant's picture in the photo array. These pieces of S.D.'s testimony again indicate that S.D.'s identification during the photo array was unreliable and should have been excluded.

¶70     As it applies to the third factor, S.D. provided an unremarkable description of the subject who entered her apartment when the police asked her for

details. In fact, she was only able to provide an estimated age and height, and did not provide "any facial descriptions." The Majority points out that S.D.'s subsequent identification and testimony about the suspect's boxy face is not inconsistent with this original description that S.D. provided to the police. Majority, ¶22. While this may be true, her prior description to the police did not reveal any possibly distinguishing features of the subject who entered her apartment either. Instead, it was not until she saw the photo array—where only the defendant's photo contained such distinguishing features as the two moles, the neck tattoo, and the boxy face—did she recall that the defendant was the person who entered her apartment. Therefore, this factor also points to S.D.'s identification of Bratchett during the photo array as being unreliable.

¶71 The fourth factor likewise points to the identification being unreliable. S.D. admitted that her identification was "not a clear decision at all," and she was in shock and not concentrating on the facial features of the intruders in her apartment. In fact, during the photo array, she was struggling to choose between two or three pictures. Ultimately, she stated that she was only 60% to 70% sure that the photo she chose was the photo of the person who entered her apartment. S.D.'s uncertainty over the photo she chose, thus, weighs in favor of the photo array being unreliable.

¶72 The fifth factor in this case is the only factor that would indicate that the identification pursuant to the photo array is reliable. The photo array was conducted close in time to the robbery. However, given the analysis under the four other factors, this is not enough, and I cannot conclude that the totality of the circumstances nevertheless renders the identification reliable. Thus, I would conclude that the trial court improperly admitted S.D.'s identification of Bratchett

because of the risk of misidentification due to the suggestiveness of the procedure used and the general lack of reliability.

## II. Ineffective Assistance of Counsel for Failure to Cross-Examine S.D.

¶73    Next, I would conclude that Bratchett's trial counsel was ineffective for failing to cross-examine S.D. regarding her inconsistent statements about what the subject said to her in the bedroom.

¶74    S.D.'s initial statement to the police, which she gave shortly after the robbery occurred, was that the subject entered her apartment and demanded her purse and debit card. S.D. instructed the subject where he could find the items in her bedroom. After the subject located both, he demanded her pin. She provided a pin number, but the subject believed S.D. was lying. She provided the pin number again, at which time he warned her that she better not be lying to him. The subject led S.D. to the bedroom, and he again warned her, "Are you lying to me, you better not be lying to me. Don't fuck with me." Once S.D. was in the bedroom, the subject's co-actor said they had to go, and the subject instructed S.D. to take off her clothes and sit on the bed. The two men then left.

¶75    S.D.'s testimony at trial, on the other hand, was that when the subject led her to the bedroom and had her sit on the bed "[h]e said, 'I will fuck you. You better not be lying to me.'" Specifically, S.D.'s testimony during trial was that, while she sat on the bed, the subject was asking her if there was anyone else in the apartment or if S.D. had any other phones, and was particularly interested if S.D. had a landline. S.D. testified that she assured the subject that no one else was home and there were no other phones. The subject then tugged on the waistband of her gym shorts, as she sat on the bed, and threatened her. Then, S.D. described that

"[h]e walked away and was—kept saying, 'You better not be lying to me' and then kept bringing up if there was any other phone that I had. I better not call the police, he said, or 'I will come fuck you.'" She further testified, though, that the two individuals in her apartment were impatient and in a hurry to leave. S.D. also testified on cross-examination that the suspect never unbuckled his pants or exposed himself, and that the encounter in the bedroom lasted only a couple of minutes.

¶76 Bratchett argues on appeal that he received ineffective assistance of counsel because his trial counsel never cross-examined S.D. about the inconsistency between her two statements about what the subject said to her at the time that he led her to the bedroom and sat her on the bed, and trial counsel's failure to do so undermines the confidence we can have in the outcome of Bratchett's conviction for an attempted sexual assault. I agree.

¶77 A defendant must show two elements to establish that his or her counsel's assistance was constitutionally ineffective: (1) counsel's performance was deficient; and (2) the deficient performance resulted in prejudice to the defense. *State v. Balliette*, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." *State v. Carter*, 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695 (citation omitted). Prejudice occurs when the attorney's error is of such magnitude that there is a "reasonable probability" that but for the error, the outcome would have been different. *State v. Erickson*, 227 Wis. 2d 758, 769, 596 N.W.2d 749 (1999). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citations omitted).

¶78    "An ineffective assistance of counsel claim presents a mixed question of fact and law." *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. "We will not reverse the circuit court's findings of fact unless they are clearly erroneous." *Id.* "We independently review, as a matter of law, whether those facts demonstrate ineffective assistance of counsel." *Id.*

¶79    First, I would conclude that counsel's performance was deficient for failing to cross-examine S.D. about her inconsistent statements about how the subject threatened her. At the *Machner* hearing, trial counsel initially testified that he could not recall why he did not cross-examine S.D. regarding her inconsistent statements about what the subject said to her in the bedroom. Trial counsel then testified that he attacked the attempted sexual assault charge by questioning whether the subject appeared aroused, and he decided not to use the statement that S.D. gave to the police because he was not sure that the police had accurately recorded S.D.'s statement.

¶80    I would conclude that this is not a valid strategic reason for failing to cross-examine S.D. about an inconsistency that has so much bearing on the subject's intentions at the time he led S.D. to the bedroom. *See State v. Domke*, 2011 WI 95, ¶41, 52, 337 Wis. 2d 268, 805 N.W.2d 364 (concluding that trial counsel's performance was deficient after trial counsel "did not articulate any valid strategic reason for not objecting"). With the little evidence the State had related to the attempted sexual assault, S.D.'s testimony of how the subject threatened her was crucial to determining whether the subject had any intention of sexually assaulting S.D., and made trial counsel's decision to ignore S.D.'s different renditions of the threats unreasonable.

¶81     Moreover, any revelation of an inaccurate statement would not have been likely to raise the jury's sympathies for S.D. because any inconsistency could have easily been explained by an inaccurate transcription of S.D.'s statement.  *See Carter*, 324 Wis. 2d 640, ¶33.  There was, therefore, no valid strategic reason to avoid cross-examining S.D. about her prior inconsistent statement that she gave to the police and doing so was an irrational trial tactic.  *See Domke*, 337 Wis. 2d 268, ¶49 ("[T]his court may conclude that an attorney's performance was deficient if it was based on an 'irrational trial tactic[.]'" (citation omitted)).  Indeed, trial counsel had a strategy to attack the subject's intentions by questioning S.D. about the subject unbuckling his pants and exposing himself, and a decision to avoid S.D.'s prior inconsistent statement about a threat that also bears on the subject's intention is incompatible with such a trial tactic.  *See id.* (noting that trial counsel's decision to ask a follow-up question was "incautious and inconsistent with any rational trial strategy").

¶82     The Majority instead concludes that trial counsel's strategy to attack the identity of the perpetrator was not irrational.  Majority, ¶36.  I do not disagree.  This was a reasonable overarching trial strategy, given the shortcomings in S.D.'s ability to identify the subject who entered her apartment that night.  However, trial counsel's overall trial strategy does not excuse his failure to attack S.D.'s testimony by using her prior inconsistent statement that she gave to the police and question the subject's true intentions in leading S.D. to the bedroom.  *See State v. Breitzman*, 2017 WI 100, ¶75, 378 Wis. 2d 431, 904 N.W.2d 93 (analyzing whether counsel's "decision not to object to other acts was inconsistent with a reasonable trial strategy").  Arguably the decision here regarding S.D.'s prior inconsistent statement is not even part of the overall trial strategy because it has nothing to do with the identity of the subject, but rather the subject's intention, regardless of his identity.

*See Carter*, 324 Wis. 2d 640, ¶32.  Given the importance of S.D.'s credibility in this matter and the lack of other evidence supporting the intent to commit a sexual assault, it was crucial to undermine S.D.'s testimony of how the subject threatened her, and trial counsel's failure to do so was deficient performance because it was not objectively reasonable, considering all of the circumstances.  *See Domke*, 337 Wis. 2d 268, ¶¶52-53; *see also Carter*, 324 Wis. 2d 640, ¶31.

¶83     Second, I would conclude that Bratchett was prejudiced by counsel's deficient performance because it kept significant evidence from the jury.  *See Domke*, 337 Wis. 2d 268, ¶60 n.11 (recognizing that prejudice can be established by trial counsel's error keeping significant evidence from the jury).  If the jury had heard the original threat S.D. said the subject made to her, it could change the jury's perception of exactly what the subject intended when he led S.D. to the bedroom, sat her on the bed, and told her to disrobe.  In such an instance, the jury could very well believe Bratchett's argument that the subject was trying to dissuade S.D. from calling for help, instead of forming any sort of intent to sexually assault her.  S.D. testified that the subject never attempted to disrobe or made any other advance towards her in furtherance of a sexual assault, and S.D. is clear in her testimony that the subject pulled on the waistband of her shorts in a manner that was not intended to pull them down and off her body.  Had the jury heard this evidence, along with S.D.'s original statement that she made to the police, the jury could have inferred that the subject had no intention of sexually assaulting S.D. and thus, could have acquitted Bratchett of this charge.

¶84     In short, the inconsistency between S.D.'s statements casts the subject's actions in two different lights, and the jury was unable to choose between the different options given that trial counsel failed to adequately present the alternative by failing to cross-examining S.D. about her inconsistent statements.  I

conclude that trial counsel's error is of such magnitude that Bratchett has shown that there is a "reasonable probability" that but for the error, the outcome regarding this charge would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Thus, I would conclude that trial counsel's failure to cross-examine S.D. about her inconsistent statements prejudiced Bratchett's defense as to his charge for attempted sexual assault.

## CONCLUSION

¶85 Accordingly, I respectfully dissent, and I would conclude that Bratchett should be granted a new trial on the grounds that S.D.'s identification following the photo array should have been excluded, and Bratchett's trial counsel was ineffective for failing to cross-examine S.D. about her different statements about what the subject said to her.